# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 01-3237

_____

| | | |
|---|---|---|
| Jan Calder, | * | |
| | * | |
| Plaintiff/Appellant, | * | |
| | * | |
| v. | * | |
| | * | Appeal from the United States |
| TCI Cablevision of Missouri, Inc., | * | District Court for the |
| doing business as TCI Media Services, | * | Eastern District of Missouri. |
| | * | |
| Defendant/Appellee, | * | |
| | * | |
| TCI Central, Inc., | * | |
| | * | |
| Defendant. | * | |

_____

Submitted:  June 14, 2002

Filed:  August 6, 2002

_____

Before WOLLMAN, RICHARD S. ARNOLD, and LOKEN, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

Jan Calder filed suit against TCI Cablevision of Missouri, Inc. (TCI) alleging that she was terminated because of her age in violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621-634, and the Missouri Human Rights

Act, Mo. Rev. Stat. §§ 213.010-213.137. The district court[1] granted summary judgment to TCI, and Calder appeals. We affirm.

**I.**

Calder, who was born on June 12, 1934, was hired by TCI in March 1985. Her duties as an account executive at TCI were to sell advertising on TCI's cable television system to St. Louis area businesses and manage individual advertisers' accounts.

On December 4, 1994, several of the accounts Calder was managing were transferred to other account executives. Jill Gainer, who was then the general manager of the St. Louis office, and Kim Wright, the local sales manager, jointly decided to transfer the accounts. When told of the switch, Calder became agitated and stated that she believed the change was being made to force her out because of her age.

In December 1995, Sonja Farrand became regional vice president of TCI. She believed that the professionalism and revenue performance of the St. Louis office were well below that of other TCI offices. To increase the office's performance, she purchased new equipment and furniture, provided training for account executives on research and sales presentations and techniques, hired John Gutbrod to replace Gainer as general manager and Pat Quesnel as the new local sales manager, and established minimum performance standards for all account executives. Under the new standards, account executives were required to make fifteen face-to-face sales calls per week, identify five new business prospects per week, make two face-to-face new business calls per week, submit a minimum of three written proposals per week to

---

[1]The Honorable Carol E. Jackson, United States District Judge for the Eastern District of Missouri.

management, prepare for and attend weekly individual business meetings with management, be proficient in using all sales resources, and be in the office from 8:30 a.m. until 5:30 p.m. or notify management of the reason for being out of the office. Account executives also had a budget of expected sales that they were supposed to reach monthly. These budgets were set one year in advance by management in consultation with the account executives and varied monthly based on changes in expected revenue.

Shortly after Farrand took over, Gainer and Wright informed her that Calder was upset about the account switches in 1994 and they expressed some concern about Calder's performance. Despite these concerns, Calder had received good performance reviews under their management. She did not fare as well under the new management. Both Gutbrod and Quesnel noticed shortly after they started working that Calder was not meeting her budgets. Calder told Gutbrod that she believed the previous management was trying to force her out because of her age. He replied by stating that age did not matter to him, only performance.

Calder's relationship with the new management deteriorated over the remainder of her time at TCI. In November 1996, Gutbrod sent Calder a memorandum criticizing her for making mistakes regarding a political candidate's commercials. He also expressed concern about her not being in the office, not meeting her budget, and not generating new business. Quesnel rated her performance as below average on her January 1997 quarterly review. On January 17, 1997, Gutbrod wrote a letter to Farrand stating that "the prudent business decision is to terminate [Calder] or at least significantly reduce her account list," but that he feared she would take legal action in response. On January 28, Gutbrod sent Calder a memo criticizing her for allowing her voice-mail box to fill up so that he could not leave her a message. Gutbrod sent Calder a memo on February 10, 1997, informing her that she had failed to meet her budget in twelve of the previous thirteen months. Gutbrod and Quesnel reassigned several of Calder's accounts as well as the accounts of other account executives

effective February 24, 1997. Quesnel testified that the reassignments were spurred by a merger that increased TCI's market share and that Calder's budget was adjusted to reflect the change in her accounts.

On March 7, 1997, Calder's attorney sent TCI a letter stating that Calder "has been subjected to discriminatory treatment by her employer" and asking that the treatment be stopped. TCI's division counsel replied by stating that TCI was unaware of any discriminatory treatment and by offering to work with appropriate management personnel to remedy any alleged discriminatory treatment upon receiving further details from Calder's counsel regarding such treatment. Calder's counsel's only response to this offer was to file the present action against TCI following Calder's termination.

Calder received her first "corrective discipline memorandum" on March 24, 1997, which stated that she was not making her budgets because she was not setting enough appointments with new clients. Quesnel later corrected this memorandum because Calder had not been credited with all her sales, and had actually achieved 99.5% of her budget. In April 1997, Farrand reminded Calder of the requirement that she submit a minimum of three proposals a week. Calder acknowledged that she had not complied with this requirement and promised to send Farrand some of her proposals, but failed to do so. On April 27, 1997, Gutbrod sent Farrand a memo in which he recounted the problems they had had with Calder and observed that the two had agreed to "document heavily" Calder's lack of performance. On Calder's July 16, 1997, performance evaluation, Quesnel and Gutbrod rated her as needing improvement in almost every category. Quesnel wrote that Calder was deficient in submitting written proposals, soliciting new clients, acquiring proficiency on new technology, and improving her dependability. In August 1997, Quesnel sent Calder a memorandum stating that she had made a mistake in setting up a commercial in the tape library and that she should either learn how to use the library properly or ask for assistance. Also in August, Quesnel criticized Calder for quoting an unapproved rate

for advertising to a client, a mistake that caused the client to decide not to advertise on TCI's cable system. In yet another August memo, Quesnel told Calder that she had to submit two proposals a week to Gutbrod and him and that she should take a manager on at least one appointment per week. In September, Quesnel wrote in a memorandum for Calder's file that one of her clients had requested that its account be transferred to another account executive. In October, Gutbrod sent Calder a memo stating that her tardiness at the weekly sales meetings was unacceptable. Only seven percent of Calder's billing through October was from new business, a much smaller proportion than any other account executive. In November, Quesnel gave Calder a memo stating that she was not filling out paperwork properly, along with two corrective discipline memorandums noting Calder's failure to meet her budgets, as well as other problems. Calder's November 1997 performance appraisal rated her as "unacceptable" or "needs improvement" in most categories and noted that she did not understand paperwork or the computer programs, did not follow procedures, did not call enough potential clients or prepare proper proposals, did not work with management, did not show initiative, did not ask for help, did not make her budget, and did not bring in enough new business. In December, Calder received a discipline memorandum stating that she was not going to meet her budget for December, that she had not secured enough new business, and that management had received only one proposal from her since her last review. On December 18, Gutbrod sent Calder a memo stating that she had violated the company's policy for new client credit applications. Calder achieved seventy percent of her budget in 1997.

On January 5, 1998, Gutbrod e-mailed Farrand and Mark Duke, TCI's vice president, suggesting that unless they saw significant improvement from Calder in the next three weeks, they should terminate her. Calder took medical leave from January 5 to early May 1998. When she returned, Quesnel sent her a memo describing the steps she needed to follow to maintain her position, including a new requirement that she take a manager on at least two sales calls per week. On June 25, Quesnel sent another memo, which stated that Calder had not improved in the areas of completing

three proposals per week, taking management on two calls per week, calling in if she did not return to the office at the end of the day, and scheduling clients thirty days in advance. Calder was terminated by Farrand, with input from Gutbrod and Quesnel, in August 1998. She was then sixty-four years old. Farrand testified that Calder was terminated because she demonstrated a lack of progress in meeting her budget, in making professional proposals, in developing skill with the quantitative and qualitative research tools provided by the company, and in not responding well in working with management.

Calder alleges that management at TCI made several discriminatory comments. During one of Calder's individual meetings with Quesnel, he told her that she should walk faster, comparing her to a younger account executive. Calder testified that Farrand told her at the April 1997 meeting that Farrand did not understand why, "at this time in [her] life," she did not want free time to travel. Calder testified that she felt this comment was discriminatory, but she did not complain about it to management. Gutbrod, on one occasion prior to April 1997, referred to a job applicant as "grandma" and hired a younger candidate.

The district court granted summary judgment to TCI, holding that Calder did not present evidence sufficient to show that TCI's reason for firing her was a pretext for age-based discrimination and that she did not show that her termination was causally linked to her complaints of age discrimination.

## II.

We review a grant of summary judgment de novo. Fisher v. Pharmacia & Upjohn, 225 F.3d 915, 919 (8th Cir. 2000). Summary judgment is proper where the evidence, when viewed in the light most favorable to the nonmoving party, indicates that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. Id.; Fed. R. Civ. P. 56(c).

The ADEA makes it unlawful for an employer to discriminate against an employee on the basis of the employee's age.[2] See 29 U.S.C. § 623(a)(1). Where the plaintiff's case is based on circumstantial evidence of discrimination rather than on direct evidence, we apply the burden-shifting scheme of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-03 (1973). See Fisher, 225 F.3d at 919. Under this scheme, Calder must first establish a prima facie case of age discrimination. Id. If she makes this showing, the burden of production shifts to TCI to articulate a legitimate, nondiscriminatory reason for any adverse employment action taken against Calder. Id. If TCI meets this burden, Calder must then present evidence sufficient to raise a question of material fact as to whether TCI's proffered reason was pretextual and to create a reasonable inference that age was a determinative factor in the adverse employment decision. Id. At all times, the burden of persuasion remains with Calder. Id.

To establish a prima facie case of age discrimination, Calder was required to show that: (1) she is a member of a protected age group; (2) she was performing her job at a level that met her employer's legitimate expectations; (3) she was discharged; and (4) TCI replaced her with a younger person. See Ziegler v. Beverly Enterprises-Minnesota, Inc., 133 F.3d 671, 675 (8th Cir. 1998). The district court assumed without deciding that Calder met this standard. TCI argues that Calder cannot satisfy the second prong of the test. We agree.

The standard for assessing performance "is not that of the ideal employee, but rather what the employer could legitimately expect." Keathley v. Ameritech Corp., 187 F.3d 915, 920 (8th Cir. 1999). The fact that an employee meets some expectations, however, does not mean that she meets the standard if she does not meet

---

[2]We apply the same analysis to Calder's Missouri Human Rights Act claim as to her ADEA claim. Dorsey v. Pinnacle Automation, Inc., 278 F.3d 830, 836 (8th Cir. 2002).

other significant expectations. Ziegler, 133 F.3d at 676. We have noted that sales volume is the principal indicator of whether a salesperson has met the employer's legitimate expectations. Fisher, 225 F.3d at 920.

There is no dispute that Calder did not meet most of the new guidelines established when the new management took over the St. Louis office. Calder argues that her sales figures show that she was performing satisfactorily, even though she does not dispute that she did not meet her sales budget for 1997. She claims that numerous other account executives also did not meet their budgets and yet were not fired.[3] However, she produced no evidence that she complied with the bulk of the new management's expectations of professionalism from its account executives. In the cases Calder relies on for the proposition that sales matter above all, the evidence demonstrated that the salespersons who were fired had excellent sales skills or were among their employers' top producers and that those employers' main expectation of salespersons was that they produce. See Fisher, 225 F.3d at 920-21 (customers and managers testified to plaintiff's sales skill and professionalism); Keathley, 187 F.3d at 920 (plaintiff maintained high sales levels and was awarded "Salesperson of the Year" three times prior to being fired). Calder has not produced evidence that she was an excellent revenue producer or that she met the new management's non-sales performance expectations. Her positive reviews under the prior management are not probative of her performance under the new management. Whether or not those new expectations constituted a good business practice is not for us to decide. See Dorsey, 278 F.3d at 837 ("Courts do not sit as super-personnel departments to second-guess the business decisions of employers."). TCI could legitimately expect its account executives to meet the guidelines, and Calder did not produce evidence that she did

_____

[3]TCI filed a motion to strike portions of the plaintiff's appendix which detail the sales figures for various account executives, claiming that they were not in evidence before the district court. We need not decide the motion because, even including the disputed records, Calder has not produced evidence sufficient to avoid summary judgment.

so. Accordingly, she failed to establish a prima facie case of age discrimination, and TCI was thus entitled to summary judgment on that claim.

Even if we assume, as did the district court, that Calder established a prima facie case, she did not produce evidence sufficient to raise an issue of material fact on whether TCI's proffered nondiscriminatory reason for firing her was pretextual or to create a reasonable inference that age was a determinative factor in the adverse employment decision.

First, Calder attributes more meaning to the allegedly discriminatory comments by TCI management than they can be rightfully said to bear. Farrand's comments that she did not understand why Calder did not want to take time to travel and Quesnel's comments that she should move faster, even viewed in the light most favorable to Calder, do not establish that they harbored age-based animus. See Ziegler, 133 F.3d at 676 (suggesting retirement to unsatisfactory employee who is eligible to retire does not provide a reasonable basis for inferring age-based discrimination). Gutbrod's reference to an applicant as "grandma," although patronizing at best, it is the type of "stray remark" that we have held does not support a finding of pretext. See Simmons v. Océ-USA, Inc., 174 F.3d 913, 916 (8th Cir. 1999); Walton v. McDonnell Douglas Corp., 167 F.3d 423, 428 (8th Cir. 1999); cf. Fisher, 225 F.3d at 922 (managers' statements included "[w]e need to get rid of the old guys" and the company "wanted to bring some of the younger people along faster"). Because none of these remarks occurred within one year of Calder's termination and none were repeated, they do not create a triable issue on the question of pretext.

Calder points out that some of the mistakes that management accused her of were not her fault but were the result of errors on the part of personnel in other divisions of the company in not properly crediting her with her sales or in improperly reading her advertising orders. At most, however, this evidence demonstrates only that the management may have been misguided as to some of the reasons for

terminating Calder, not that they discriminated against her. See Dorsey, 278 F.3d at 837-38 (question is whether articulated reason is the true reason, not whether it was correct). Calder also does not dispute that she did not meet her budget goals, did not identify new business prospects, did not bring in as much new business as other account executives, did not send her proposals to Farrand or local management, did not fully understand the new research tools TCI provided, and did not take managers on sales calls as often as required. She also does not dispute that some clients wanted her removed from their accounts, although she claims the errors that led to these requests were not her fault.

Instead, Calder alleges that the managers developed a plan to falsify her employment record by doing such things as providing false performance reviews, taking away her accounts, and raising her sales budget so she could not meet it. Her only evidence supporting this theory, however, is the April 27, 1997, memorandum from Gutbrod to Farrand in which he stated that they had agreed to "document heavily" Calder's errors. Giving Calder the benefit of the most sinister meaning a jury might attribute to Gutbrod and Farrand's decision to "document heavily," we do not believe that it is sufficient to carry Calder's burden in light of the fact that she does not dispute the accuracy of much of the resulting documentation. Accordingly, in light of the uncontroverted evidence of her errors and her failure to meet the company's standards, we conclude that Calder has not presented evidence sufficient to create a triable issue on the question of pretext or to create a reasonable inference that age was a factor in her termination.

## III.

Calder also contends that the district court erred in granting summary judgment on her retaliation claim. To establish a prima facie case of retaliation, Calder was required to show that she participated in a protected activity, that TCI took an adverse employment action against her, and that a causal connection exists between the two.

Herrero v. St. Louis Univ. Hosp., 109 F.3d 481, 485 (8th Cir. 1997). Assuming that Calder's complaints constituted protected activities, we conclude that she has not shown a causal connection between her complaints and her termination.

Calder first complained of age-based discrimination in 1995. Following this complaint, she received a positive evaluation. Her only other complaint was her attorney's March 1997 letter. We have held that a gap in time between the protected activity and the adverse employment action "weakens the inference of retaliation that arises when a retaliatory act occurs shortly after a complaint." Dhyne v. Meiners Thriftway, Inc., 184 F.3d 983, 989 (8th Cir. 1999); see also Sims v. Sauer-Sundstrand Co., 130 F.3d 341, 343 (8th Cir. 1997). Here, seventeen months elapsed between her attorney's letter and Calder's termination. The doubt created by this time gap is reinforced by the undisputed evidence of Calder's failure to meet her employer's expectations.

In any event, even if it could be said that Calder established a prima facie case of retaliation, the evidence described above forecloses any finding that the reasons given for firing her were pretextual. Filing a complaint does not "'clothe [Calder] with immunity for past and present inadequacies, [and] unsatisfactory performance.'" Kneibert v. Thomson Newspapers, Michigan, Inc., 129 F.3d 444, 455 (8th Cir. 1997) (quoting Jackson v. St. Joseph State Hosp., 840 F.2d 1387, 1391 (8th Cir. 1988).

The judgment is affirmed.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

-11-