**Lee Ann KROUGH, Plaintiff,**

v.

**CESSFORD CONSTRUCTION COMPANY, Defendant.**

No. 4:01–CV–90179.

United States District Court, S.D. Iowa, Central Division.

Oct. 7, 2002.

Michael J. Carroll, Coppola, Sandre & McConville PC, West Des Moines, IA, for Plaintiff.

Paul C. Peglow, Johnson, Sudenga, Latham & Peglow, Marshalltown, IA, for Defendant.

## MEMORANDUM OPINION AND ORDER

PRATT, District Judge.

Plaintiff, Lee Ann Krough, brings this action against her previous employer, alleging violations of Title VII of the Federal Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, the Iowa Civil Rights Act, Iowa Code Chapter 216 (ICRA), and the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* (ADA). Defendant Cessford Construction Company (Cessford) now moves for summary judgment. The Court heard oral argument on the motion on October 3, 2002. For the following reasons, the motion is granted.

## I. BACKGROUND

Plaintiff, Lee Ann Krough, was born in 1949, and graduated from high school in Gilman, Iowa in 1967. After graduation, the majority of her employment experience was either as a cook or the owner of a café in Van Horne, Iowa. As well, Plaintiff is a four-time national and five-time state arm wrestling champion.[1] She also owns Monster Arm Wrestling, an automated arm wrestling tournament machine with which she hosts ann wrestling tournaments at the Iowa State Fair and at local and regional bars. Defendant, Cessford Construction Company (Cessford), of Le-Grand, Iowa, produces and lays hot mix asphalt to build roads. In April 1994, Krough began working as a "flagger" on one of Defendant, Cessford Construction Company's, road construction crews. By nature, Cessford's business was seasonal, and at the end of every construction season, all non-salaried employees were laid off. Accordingly, Krough was laid off at the end of the every season she worked, 1994–1999.

Near the end of the 1994 construction season, Cessford hired Phil Smithhart as an equipment operator. Smithhart's background included twenty years in the United States Army wherein he attended an NCO academy and received extensive training in computers, management, and heavy equipment operation. At the end of

---

1. Ms. Krough was the Iowa arm wrestling champion from 1980–1984. She held the national crown between 1981–1984.

the 1994 construction season, Cessford sent Smithhart to training sponsored by the Iowa Department of Transportation (I–DOT) for Aggregate Inspection, Plant Inspection, and Bituminous ´Lab Inspection. At the commencement of the 1995 season, Smithhart served as a lab technician under Ted Huisman, the head of Cessford's Inspection and quality control department (QMA). His additional responsibilities included tearing down the trailer and plant at Cessford's various remote job-sites, operating an end-loader, and assisting in the operation of the plant. Smithhart's starting wage in QMA was $11.00 per hour. At the end of the 1996 season, the asphalt plant foreman retired, and Cessford promoted Smithhart into the foreman position.

Before the start of the 1996 construction season, Cessford sent Krough for training with the I–DOT. As a result, Krough became certified in Plant Inspection and as a Bituminous Lab Technician. During the 1996 season, she continued to work as a flagger, but also assisted Smithhart in the laboratory testing asphalt samples. After the 1996 season, Krough was involved in a serious car accident. She suffered a broken hip and had a portion of her pancreas and gallbladder removed. Although her recovery was substantial, the accident left her with a slight limp and diabetes.

In the spring of 1997, Cessford offered Krough a full-time QMA position. Her job as a lab technician involved testing asphalt samples, part of the work done by Phil Smithhart. Unlike Smithhart, she had no education or training beyond a high-school diploma, and had little, if any, experience with computers. As well, Krough's duties did not include operating an end-loader or operating the asphalt plan. When she started in QMA, Defendant raised her wage from $6.50 to $9.00 per hour. She continued working in QMA in the 1998 season and received a raise to $10.50 per

hour. Cessford rehired Krough once again for the 1999 season, and gave her another pay raise to 11.05 per hour.

When Krough joined the QMA department, Huisman explained that although the wage rate for certain construction workers increased when the company worked federal projects, federal law excluded inspectors from these increases. Cessford had one federal project in 1997 and another in 1998. Krough worked on both of these projects, and received no wage increase.

On June 14, 1999, Krough's good friend, J.B. Marks was fired for sexually harassing three co-workers. Marvin Baker, the boyfriend of one of the three women involved had made the complaint about the harassment to Joe McGuire, Cessford's equal employment opportunity officer. Krough was upset by the decision, and talked about it with several co-workers and other supervisors.

On June 25, 1999, Krough requested a meeting with Joe McGuire, the EEO officer, and Heidi Krabbe, one of Cessford's owners. At the meeting Krough complained about being sexually harassed by Marvin Baker and about her wages. She alleged that twice that spring, Baker had reached inside the pickup truck she was driving and had rubbed her left breast. McGuire said he would investigate the matter.

As to her wages, Krough complained that it was unfair that Smithhart had started at a higher wage than her. She also complained that she would not get federal pay when the company went to a federal project later that summer. McGuire stated that he would have to talk to Huisman about the pay issues. Krough continued, and further complained that she should have received worker's compensation for the injuries she sustained in her car accident three years prior. She talked

about surgeries she had to undergo, and then queried "are you paying me less because I'm a woman or because I'm a cripple?" McGuire told her that he did not consider her a cripple. Except for this remark, Krough's wage complaints made no mention of sexual discrimination.

After the meeting, McGuire followed up on the sexual harassment and wage claims. He interviewed Baker and several other crew members regarding the alleged harassment, but found no corroborating evidence. McGuire also spoke with Huisman about the wage issue. Huisman informed him that inspectors were not eligible for federal pay, and that Krough knew this. As well, Huisman explained that Smithhart's starting wage reflected his military experience, knowledge of computers and heavy equipment, personnel and personal skills, and additional responsibilities. McGuire reported his findings to Krough. Krough, dissatisfied with McGuire's investigation reported her harassment complaint to the I–DOT. The I–DOT also investigated her claim, but found no evidence of sexual harassment.

Following her meeting with McGuire, Krough's attitude and relationship with her co-workers commenced a decidedly negative trajectory. Krough continued to complain about the fact that she would not receive a pay increase for the company's federal project. Although the measure of hyperbole is unclear, Huisman stated that throughout the months of June and July, Krough "constantly" complained about her wages. She also voiced her complaint to the Association of General Contractors who advised her that under the law, she was not entitled to an increase in pay when the company worked on a federal job. In turn Krough told truckers who were entitled to the wage increase that none would

be forthcoming. During this time, Krough often threatened to quit work. As a result of her actions, her co-workers began to avoid her. Larry Billick, the man she described as her mentor, stated that he was so disgusted with her that he did not want to talk to her.

In addition to her attitude, Krough's work performance deteriorated.[2] Krough often complained about the lab thermostat being too close to the oven resulting in a cold lab. On one occasion she asked Huisman whether she could move the thermostat over to her side of the lab. Huisman informed her that the sensitivity of the instruments necessitated the placement by the oven. Without reference to Huisman's orders, Krough asked another supervisor to move the thermostat. As well, in the summer of 1999, Krough began selling hamburgers and hot dogs to other employees out of the lab. Her supervisor, Huisman, told her to stop selling food. Rather than quit, however, Krough placed a "donations" bucket on the counter and continued selling food under the guise that any payments received were donations. She stopped only after Huisman confronted her a second time.

As the federal project approached Krough made complaints about her wages "as often as she could." Plaintiff's Appendix 3 ¶ 8. When asked about the job by Huisman, Krough replied that she would not work the federal project, but expected to be called back when it was finished. On August 20, 1999, Huisman called Krough to once again ask whether she would report to the federal project on the August 23rd start date. Krough requested a couple of days off which Huisman granted, telling her she could show up on August 25th. Krough again requested a pay raise

**2.** Examples of poor performance abound and Plaintiff does not deny the occurrence of the events, only that she did not know that they were wrong. Rather than list every instance of insubordination, the Court finds it sufficient to detail certain notable events.

to work on the project which Huisman again refused.

On August 25th, when she was expected to start working, Krough did not show up and did not call. After Huisman reached her on her cell phone, Krough explained that she had a chiropractor's appointment and was helping her daughter move. She said she would show up the next day. Krough, however, did not appear and did not call on the following day. Krough was a no show on August 27th as well. She did, however, call on August 27th, and told Huisman that she was going to work for Heartland Asphalt, one of Cessford's competitors. True to her word, Krough went to work for Heartland Asphalt for the next two days. She, however, showed up for work at Cessford on August 30th, and was allowed to keep her job.

Krough's attitude from August 30th to the end of the season was exceedingly negative. Truck drivers and other personnel that would normally have contact with her tried to avoid her as much as possible. Krough did work until Cessford ended its operations for the season in mid-October. The next spring, on March 13, 2000, Krough called Cessford about coming back to work that summer. She was informed that she would not be rehired.[3]

Krough filed a complaint with the Iowa Civil Rights Commission which was cross-filed with the federal Equal Employment Opportunities Commission on or about June 5, 2000. Upon receiving right to sue notifications from both agencies, she filed the present lawsuit in this Court.

## II. SUMMARY JUDGMENT

The purpose of summary judgment is to "pierce the boilerplate of the pleading and assay the parties' proof in order to determine whether trial is actually required."

11 Moore's Federal Practice 3d, § 56.02, pg. 56–20 (Matthew Bender 3d ed.1997) (citing *Wynne v. Tufts Univ. School of Medicine*, 976 F.2d 791, 794 (1st Cir.1992), cert. denied, 507 U.S. 1030, 113 S.Ct. 1845, 123 L.Ed.2d 470 (1993)).

■ Summary judgment is properly granted when the record, viewed in the light most favorable to the nonmoving party and giving that party the benefit of all reasonable inferences, shows that there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Walsh v. United States*, 31 F.3d 696, 698 (8th Cir.1994); *City of Columbia*, 914 F.2d at 153; *Woodsmith Publ'g*, 904 F.2d at 1247. The moving party must establish its right to judgment with such clarity that there is no room for controversy. *Jewson v. Mayo Clinic*, 691 F.2d 405, 408 (8th Cir.1982).

The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact based on the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Once the moving party has carried its burden, the nonmoving party must go beyond the pleadings and, by affidavits or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is genuine issue for trial. *See* Fed.R.Civ.Pro. 56(c),(e); *Celotex Corp.*, 477 U.S. at 322–23, 106 S.Ct. 2548; *Anderson*, 477 U.S. at 257, 106 S.Ct. 2505. "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat a motion for summary judg-

---

**3.** During the winter, Krough responded to a blind job listing for an asphalt inspector that she later learned was Cessford's attempt to fill her job.

ment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson,* 477 U.S. at 247–48, 106 S.Ct. 2505 (emphasis added). An issue is "genuine," if the evidence is sufficient to persuade a reasonable jury to return a verdict for the nonmoving party. *Id.* at 248, 106 S.Ct. 2505. "As to materiality, the substantive law will identify which facts are material....Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

## III. ANALYSIS

■ Ms. Krough charges that Cessford illegally discriminated against her under Title VII and the ICRA by paying her less than similarly situated male employees, and by retaliating against her once she complained of the pay discrepancy and sexual harassment.[4] Federal case law supplies the basic framework for deciding cases under the ICRA. *Quick v. Donaldson Co., Inc.,* 90 F.3d 1372, 1380 (8th Cir. 1996) (citing, *Iowa State Fairgrounds Sec. v. Iowa Civil Rights Comm'n,* 322 N.W.2d 293, 296 (1982)). Iowa courts "traditionally turn to federal law for guidance on evaluating the ICRA, but federal law ... is not controlling." *Vivian v. Madison,* 601 N.W.2d 872, 873 (Iowa 1999) (citations omitted). Ms. Krough does not offer any separate legal arguments relating to the ICRA. Consequently, Ms. Krough's claims of sexual discrimination are addressed together, as are her claims regarding retaliation.

### A. Title VII Standard

The analytical framework for both Plaintiff's claim of equal pay discrimination and her claim of discriminatory retaliation are identical, but depend first on whether Plaintiff presents direct or circumstantial evidence of the alleged discrimination. If primarily circumstantial evidence is presented, the Court examines the evidence under the tripartite analysis set forth in *McDonnell Douglas Corp., v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under *McDonnell Douglas,* Plaintiff bears the first burden of establishing a prima facie case of discrimination by showing that "she was a member of a protected class and suffered an adverse employment action that others outside her class did not suffer." *Mohr v. Dustrol, Inc.,* 306 F.3d 636 (8th Cir.2002) (citations omitted). If Plaintiff clears the first hurdle, the burden shifts to the Defendant to show legitimate nondiscriminatory reasons for the adverse action. *Id.* Upon making such a showing, the burden shifts again to the Plaintiff to counter by the preponderance of the evidence the legitimacy of Defendant's proffered nondiscriminatory reasons, showing instead that they are merely pretext for discrimination. *Id.* As the parties traverse the steps of the analysis, one must never forget that the plaintiff bears the ultimate burden of persuading the trier of fact that the Defendant intentionally discriminated against her. *Id.*

If, however, a plaintiff's produces direct evidence of an illegal impetus for the challenged employment decision, the plaintiff is relieved of her ultimate burden of persuasion and a "mixed motive" analysis applies. *Id.* Under the mixed motive analysis, "once the plaintiff persuades a factfinder that, more likely than not, discrimination was 'a motivating part in an employment decision,' the burden shifts to the employer to prove that the employ-

---

4. Plaintiff's complaint also states a claim for discrimination under the ADA. Defendant challenged the claim in its present motion for summary judgment. Plaintiff, however, has not resisted Defendant's attack either in her resisting papers or at oral argument. As Defendant's arguments are both compelling and unresisted, Defendant's motion is granted with regards to Plaintiff's ADA claim.

ment decision would nevertheless have been made for legitimate, nondiscriminatory reasons." *Id.* (quoting *Yates v. McDonnell Douglas,* 255 F.3d 546, 548 (8th Cir.2001)) (quoting *Price Waterhouse v. Hopkins,* 490 U.S. 228, 254, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989)).

## B. Equal Pay

■ Plaintiff offers no direct evidence of discrimination to support her equal pay claim. Consequently, the *McDonnell Douglas* test provides the proper framework for analyzing her equal pay claim. Cessford, however, argues that the Court need not review the claim under the test because Plaintiff failed to file her claim within the time limits of § 2000e–5, and the ICRA. The Court agrees.

Plaintiff's equal pay claim is premised on the fact that she was paid two dollars less per hour upon starting in QMA than was Phil Smithhart. When, as here, an aggrieved party files a claim both with the EEOC and an applicable state agency, § 2000e–5(e)(1) requires the claim be filed within three hundred days after the alleged unlawful employment practice occurred.[5] Plaintiff argues that her claim was timely filed as the pay discrepancy was a continuing violation that continued until she was not rehired in March of 2000. This argument is without merit.

The United States Supreme Court has "repeatedly interpreted the term "practice" to apply to a discrete act or single "occurrence," even when it has a connection to other acts." *Amtrak v. Morgan,* 536 U.S. 101, 122 S.Ct. 2061, 2071, 153 L.Ed.2d 106 (2002). Accordingly, each discrete act of discrimination starts a new clock running for the filing of a claim. *Id.* at 2072. In contrast, the Court in *Morgan* explained that the application of the continuing violation theory, allowing claims to be filed for actions occurring after the statute of limitations has lapsed when the violations constitute a continuing practice of discrimination, is limited to claims such as claims for a hostile work environment where the nature of the claim is ongoing discrimination and one example of discrimination does not prove the charge. *Id. at* 2071–2073. Such is not the case here. The decision to start Plaintiff at a lower wage than it had started Smithhart was a discrete action constituting an alleged unlawful employment practice. Plaintiff offers no evidence of a continuing pattern of wage discrimination. "Mere continuity of employment, without more, is insufficient to prolong the life of a cause of action for employment discrimination." *Delaware State College v. Ricks,* 449 U.S. 250, 257, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980). Krough was fully aware of the wage discrepancy when she accepted the QMA position on April 12, 1997, and is, therefore, not entitled to a tolling of the statute of limitations. Thus, her complaint to the EEOC on June 6, 2000, was over two years past the three hundred day limit. Accordingly, Plaintiff's equal pay complaint is time barred under both Title VII and the ICRA.

■ Assuming arguendo that Krough's equal pay claim is not time barred, Cessford is still entitled to summary judgment. The evidence, taken in a light most favorable to Krough, does not show that she was a similarly situated employee with Phil Smithhart, her discrepant touchstone. Beyond his role as a QMA lab technician, Smithhart's job responsibilities included operating an end loader, operating the portable asphalt plant, and setting up and tearing down the plant at the beginning and end of jobs. Krough's responsibilities were limited to the testing of asphalt sam-

---

**5.** The ICRA is stricter, limiting the filing period to one hundred eighty days after the alleged unlawful incident. Iowa Code § 216.15(12).

ples and other administrative lab tasks. Such is not a description of similarly situated employees. If, however, they are similarly situated, Cessford has advanced a multitude of legitimate reasons for starting Smithhart at a higher salary, not the least of which is what even Plaintiff concedes is a tremendous military career. Juxtaposing Smithhart's army training and experience with Plaintiff's lack thereof would leave any reasonable factfinder unable to find a discriminatory motive behind the pay discrepancy. Defendant is entitled to summary judgment on Plaintiff's equal pay claims.

## C. Retaliation

Plaintiff suggests the record shows direct evidence that Cessford took retaliatory action against Plaintiff because of her complaints regarding her wages. Specifically, Plaintiff points to Mr. Huisman deposition testimony. When asked by Plaintiff's counsel if he thought it was a bad idea for Krough to complain about the wage differential between her and Smithhart, Huisman replied:

A. Well, you know, whatever she did, you know, good or bad, it didn't make any difference to me.

She complained about wages constantly. She complained not just that she felt she should have started at the same wage as Phil, but whenever she was given raises, she complained that it wasn't enough. She complained, and in her complaining said, "If I don't get a raise, I'll quit."

Q. Did it get under your skin that she complained about the wage issue?

A. There were times when it really burned me up, yeah. Plaintiff's App. 52.

"Direct evidence is that which demonstrates a specific link between the alleged discriminatory animus and the challenged [employment] decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated [the employer's] decision to take the adverse employment action." *Mohr v. Dustrol, Inc.,* 306 F.3d 636 (8th Cir.2002) (citations omitted). Huisman's statements do not demonstrate a specific link between Krough's complaint regarding her wages and Cessford's decision not to rehire her the following spring. At most Huisman's statements reflect the tempered frustration of a supervisor who was repeatedly placed in the uncomfortable position of hearing a disgruntled employee's incessant complaints about her pay. Assuming Krough's meeting with Joe McGuire and the equal pay complaint she alleged therein was a protected activity, Huisman's statements make no mention of this complaint.[6]

The Court is left with a question Plaintiff has not answered, how many times does an employer have to listen to an employee complain about her wages after the employer has made a full investigation into the employees complaints before the employer is justified in showing his malcontent employee the door? In this case, Huisman deserves credit for several of Krough's substantial pay raises. The evidence shows he handled each of her many wage complaints respectfully, notwithstanding the fact that these complaints mostly centered around the receipt of federal pay, for which Krough knew she was not eligible. The fact that Huisman later admitted that Krough's many wage complaints sometimes "really burned him," is

---

**6.** Plaintiff's complaint alleges only the meeting with McGuire as a protected activity. In oral argument Plaintiff's counsel suggested that each and every time Krough complained about pay she was engaging in a protected activity. The Court disagrees. In any regard, Plaintiff has failed to specifically identify any other protected activities.

not direct evidence of discrimination. It is merely evidence of humanity.

■ As Krough offers no direct evidence, the Court again looks to the *McDonnell Douglas* test for discrimination. To establish a prima facie case of retaliation, Krough must prove: 1) that she participated in a protected activity; 2) that Cessford took an adverse employment action against her; and 3) that a causal connection exists between the two. *Calder v. TCI Cablevision of Missouri, Inc.,* 298 F.3d 723 (8th Cir.2002). Assuming again that Krough's complaint to Joe McGuire was a protected activity, Krough has not shown a causal connection between her complaint and Cessford's decision not to rehire her.

Krough met with Joe McGuire on June 25, 1999. At the meeting she formally complained about the apparent disparities between her starting pay and that of Phil Smithhart, and the fact that she would not receive federal pay for federal jobs. As well, she alleged that she had been sexually harassed on two occasions by Marvin Baker. Following the meeting, McGuire investigated all three complaints thoroughly and reported his findings back to Krough. The undisputed evidence shows that between June 25, 1999, and October 20, 1999 when Krough's QMA division ceased operation for the season: Krough was twice reprimanded for selling food out of the lab; she disobeyed the orders of her supervisor and then circumvented his authority; and most notably, she continued to complain often to her supervisor about not receiving federal wages and typically threatened to quit if her wage demands were not met; and she then told her supervisor that she would not work the federal job, but expected to be called once the job was finished. Finally, and perhaps most notably, she told her supervisor that she would work the federal job so long as she could have a couple days off, but then

failed to call or show up for several days, during which time she went to work for one of Cessford's competitors. Notwithstanding Krough's blatant and numerous examples of gross insubordination, Cessford allowed her to return to her job and finish the season. Krough, however, asserts that Cessford's decision not to rehire her the following March was retaliation for the complaint she made nine months prior. The Eighth Circuit has held that a gap in time "weakens the inference of retaliation that arises when a retaliatory act occurs shortly after a complaint." *Dhyne v. Meiners Thriftway, Inc.,* 184 F.3d 983, 989 (8th Cir.1999). Here nine months elapsed between Krough's complaint and Cessford's decision not to rehire her. Couple the doubt created by this time gap with Plaintiff's actions and attitude at the end of the season and no reasonable factfinder could connect the events as discriminatory retaliation. *See Calder,* 298 F.3d at 731.

■ In her defense, Krough argues that the Court should overlook Krough's vocational transgressions during the 1999 season because no one at Cessford told her they were upset with her, or that her job was in jeopardy because of her behavior. Superlative ignorance such as Plaintiff asks the Court to ascribe her is neither possible, nor is it a defense. In an at will employment state such as Iowa, an employer need not explain each and every motive for terminating an employee upon so doing. The Court again queries, to what extent should the law punish employers for exhibiting human nature? Avoiding confrontation is to be expected. In any event, even if it could be said that Krough has established a prima facie case of retaliation, her behavior and attitude as described above forecloses any finding that the decision not to rehire her was a pretext to any underlying discrimination. *Id.* Filing her complaint did not "clothe [Ms.

Krough] with immunity for past and present inadequacies [and] unsatisfactory performance." *Id.* (quoting *Kneibert v. Thomson Newspapers, Michigan, Inc.*, 129 F.3d 444, 455 (8th Cir.1997) (quoting *Jackson v. St. Joseph State Hosp.*, 840 F.2d 1387, 1391 (8th Cir.1988). Defendant's motion for summary judgment is granted on Plaintiff's retaliation claims.

## IV. CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is granted on all counts.

IT IS SO ORDERED.