Tatsuo TOMITA, M.D., Plaintiff,

v.

**UNIVERSITY OF KANSAS MEDICAL CENTER, et al., Defendant.**

No. CIV.A.01–2297–KHV.

United States District Court,
D. Kansas.

Oct. 8, 2002.

Stephen D. Kort, Jennifer Linscott Danker, Carlson Kort, L.C., Kansas City, MO, for Tatsuo Tomita.

John C. McFadden, Kansas City, KS, for University of Kansas Medical Center, Deborah E. Powell.

John C. McFadden, Kansas City, KS, Lee M. Smithyman, Smithyman & Zakoura, Chtd., Overland Park, KS, for University Pathology Ass'n., Barbara Atkinson.

### MEMORANDUM AND ORDER

VRATIL, District Judge.

Tatsuo Tomita, M.D. brings suit against University Pathology Association ("UPA") and Barbara Atkinson, M.D. for breach of employment contract, retaliation and discrimination on account of race and national origin in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, 42 U.S.C. § 1981, and the Kansas Acts Against Discrimination ("KAAD"), K.S.A. § 44–1001 *et seq.*[1] This matter comes before the Court on the *Motion For Summary Judgment By University Pathology Association And Barbara Atkinson, M.D.* (Doc. # 57) filed June 14, 2002. For reasons stated below, the Court sustains defendants' motion. The Court grants summary judgment in favor of defendants on plaintiff's claims of discrimination and breach of contract. Plaintiff's retaliation claims, which defendants' summary judgment motion does not address, remain in the case.

### I. Summary Judgment Standard

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Rule 56(c), Fed.R.Civ.P.; *accord Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Vitkus v. Beatrice Co.,* 11 F.3d 1535, 1538–39 (10th Cir.1993). A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. A "genuine" factual dispute requires more than a mere scintilla of evidence. *Id.* at 252, 106 S.Ct. 2505.

The moving party bears the initial burden of showing the absence of any genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Hicks v. City Of Watonga, Okla.,* 942 F.2d 737, 743 (10th Cir.1991). Once the moving party meets its burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial "as to those dispositive matters for which it carries the burden of proof." *Applied Genetics Int'l, Inc. v. First Affiliated Secs., Inc.,* 912 F.2d 1238, 1241 (10th Cir.1990); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Bacchus Indus., Inc. v. Arvin Indus., Inc.,* 939 F.2d 887, 891 (10th Cir.1991). The nonmoving party may not rest on its pleadings but must set forth specific facts. *See Applied Genetics,* 912 F.2d at 1241.

The Court must view the record in a light most favorable to the party opposing the motion for summary judgment. *See Deepwater Invs., Ltd. v. Jackson Hole Ski Corp.,* 938 F.2d 1105, 1110 (10th Cir.1991). Summary judgment may be granted if the non-moving party's evidence is merely col-

---

1. Plaintiff originally sued UPA, Dr. Atkinson, the University of Kansas Medical Center and Deborah E. Powell, M.D. The parties, however, agreed to dismiss KUMC and Dr. Powell.

orable or is not significantly probative. *See Anderson*, 477 U.S. at 250–51, 106 S.Ct. 2505. "In a response to a motion for summary judgment, a party cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial." *Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir.1988). Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52, 106 S.Ct. 2505.

## II. Facts

The following facts are either uncontroverted or construed in a light most favorable to plaintiff:

Plaintiff is an Asian man from Japan. From 1977 through March 30, 2002, he worked as professor of pathology for UPA and the Kansas University Medical Center ("KUMC").[2] During his employment, the following persons supervised plaintiff:

| President/ Chairperson | Tenure |
|---|---|
| Dr. Clarke Anderson | January 1978—June 1990 |
| Dr. Frank Cuppage | June 1990—July 1992 |
| Dr. Ivan Damjanov | June 1994—November 1997 |
| Dr. Bill Jewel | November 1997—October 1998 |
| Dr. James Fishback | October 1998—October 1999 |
| Dr. Barbara Atkinson | October 1999—March 2002 |

Each supervisor held dual positions as president of UPA and chairperson of the KUMC pathology department.

### A. Plaintiff's Performance

From 1975 through 1999, plaintiff performed his teaching, clinical, service and research assignments satisfactorily or better.[3] During this time, plaintiff's supervisors did not give him an unfavorable review, nor did they discipline him for poor performance.[4] Plaintiff's clinical assign-

---

**2.** Defendants assert that UPA and KUMC jointly employed plaintiff, in that plaintiff provided academic and teaching services to KUMC for half his salary and provided clinical services (*i.e.* patient health care) to UPA for the other half. *See University Pathology Association And Barbara Atkinson, M.D.'s Memorandum In Support Of Motion For Summary Judgment ("Defendants' Memorandum")* (Doc. # 58) filed June 14, 2002. Defendants provide no record support for their assertion, however, so the Court includes this information for background purposes only.

**3.** From 1976 through 1997, the UPA presidents evaluated plaintiff as part of his reappointment to the medical staff. In each evaluation, the president rated plaintiff as performing satisfactorily.

**4.** In their reply memorandum, defendants assert that plaintiff's supervisors did not review him annually before 1999. *See Reply Memorandum In Support Of Motion For Summary Judgment By University Pathologists And Barbara Atkinson, M.D. ("Defendants' Reply")* (Doc. # 70) filed July 18, 2002. Defendants,

however, do not respond to plaintiff's statement of additional facts in numbered paragraphs, in compliance with D. Kan. Rule 56.1(c). Instead, defendants present a narrative of factual assertions, in unnumbered paragraphs, with only occasional references to the number of plaintiff's fact paragraph that is disputed. Moreover, defendants improperly include new facts and evidence which were not part of their original motion or plaintiff's response. *See Boilermaker-Blacksmith Nat'l Pension Fund v. Gendron*, 67 F.Supp.2d 1250, 1257 (D.Kan.1999). The Court does not consider factual statements which rely on new evidence and/or do not comply with D. Kan. Rule 56.1(c). Similarly, the Court does not consider factual assertions which the parties set forth only in the argument section of their brief and not in their numbered fact paragraphs. *See, e.g., Plaintiff's Memorandum In Opposition To Motion For Summary Judgment By University Pathology Association And Barbara Atkinson, M.D. ("Plaintiff's Memorandum")* (Doc. # 68) filed July 8, 2002 at 27–28 (discussing teaching assignments of Dr. Cunningham for first time in argument section).

ment during this time was to attend autopsies for three months per year. From 1978 to 1983, plaintiff performed administrative duties as examination coordinator of a sophomore pathology course. Plaintiff did not perform administrative duties after 1983. From 1975 through 1999, plaintiff's supervisors did not criticize the amount of plaintiff's teaching or clinical assignments, and they did not require plaintiff to perform additional administrative duties or obtain grant funding for his research.[5] During this time, plaintiff did not refuse a teaching, clinical or service assignment from his supervisors.

Plaintiff's supervisors contend that they perceived that plaintiff performed poorly, and that they paid him a lower salary than other UPA physicians because (1) plaintiff spent 20 hours or less, per year, teaching medical students and residents;[6] (2) until April 2000, plaintiff's only clinical responsibility (*i.e.* revenue generating patient care activity) was to be on call to supervise autopsies for up to three months per year; and (3) plaintiff spent the vast majority of his time on unfunded research studies which provided no economic or political benefit to KUMC or UPA.

Plaintiff's supervisors assert that plaintiff contributed less to UPA than most other physicians. Dr. Anderson states that plaintiff's contributions were "as low or lower than any other physicians within UPA." *Affidavit Of Dr. H. Clarke Anderson ("Anderson Affidavit")* ¶ 7, Defendants' Exhibit 1. Dr. Cuppage describes

plaintiff as "my single biggest problem, because he was a poor performer who did not relate to people well."[7] *Affidavit Of Dr. Francis "Pete" Cuppage ("Cuppage Affidavit")* ¶ 4, Defendants' Exhibit 4. Dr. Damjanov states that plaintiff "contributed less to UPA than almost any other physician within the organization." *Affidavit Of Dr. Ivan Damjanov ("Damjanov Affidavit")* ¶ 3, Defendants' Exhibit 5. Dr. Fishback concurs that plaintiff's "contributions to UPA were as low or lower than any other physicians within UPA." *Affidavit Of Dr. James Fishback ("Fishback Affidavit")* ¶ 5, Defendants' Exhibit 6.

During the 1990s, plaintiff's sole responsibilities were: (1) presenting five one-hour lectures per year; (2) giving 45 hours of group presentations per year; and (3) supervising 20 to 35 autopsies per year. From 1995 through 1999, the only revenue which plaintiff generated for UPA was through attending autopsies.[8] During this time, plaintiff did not apply for research funding. Instead, plaintiff funded himself so that he could be free to do what he wanted to do.

In 1991, plaintiff discovered an erroneous diagnosis by Dr. Patricia Thomas. Two years earlier, Dr. Thomas had diagnosed a recurring tumor as interductal papilloma, benign. When the tumor returned in 1991, plaintiff diagnosed it as cystosarcoma phyllodes, intermediate grade. Plaintiff reviewed the biopsy which Dr. Thomas had previously performed and

---

5. Plaintiff received grants to fund his research through 1992. After 1992, he had enough grant money remaining to fund his research through 1994. Beginning in 1995, plaintiff funded his research with his own money.

6. UPA does not have an hourly teaching requirement for pathologists. The teaching expectation of each faculty member depends on his or her job.

7. Although the record contains evidence that plaintiff did not get along well with others, defendants do not cite that as a reason for their conduct and the Court does not consider it herein.

8. Plaintiff generated revenue by consulting in surgical pathology in 1999, but UPA attributed such revenue to other physicians.

found that Dr. Thomas had mis-diagnosed the patient two years earlier.

On August 20, 1998, UPA president Dr. Bill Jewel completed a medical staff reappointment evaluation of plaintiff. The evaluation form asked whether plaintiff's performance was favorable or unfavorable in several areas including basic medical knowledge, professional judgment, sense of responsibility, clinical competence, technical skill and ability to work with others. Dr. Jewel marked favorable in all areas. In addition, the form asked whether plaintiff had exhibited disruptive behavior or had been the subject of complaints by others. Dr. Jewel answered negative to both questions. Dr. Jewel recommended reappointed for plaintiff without reservation.

On May 12, 1999, UPA president Dr. Fishback completed an annual faculty review of plaintiff. Dr. Fishback marked the plaintiff had met expectations.[9] The review indicated that plaintiff's responsibilities included (1) teaching five lectures; (2) teaching two hours of small groups per week, shared with another faculty member; and (3) attending autopsies for three months of the year. Dr. Fishback remarked: "[Plaintiff] continues to work in his laboratory, using his own monies to fund immunohistochemistry research. He has been quite productive in publishing his research, despite lack of grant support." Plaintiff's Exhibit 17 at 2. For the following year, Dr. Fishback proposed that plaintiff revise the surgical pathology gross room manual and supervise residents in the surgical pathology gross room. Dr. Fishback did not set any goals for plaintiff to perform administrative duties or obtain grant funding for his research.

In April 2000, Dr. Atkinson reviewed plaintiff's performance from March 1999 to March 2000.[10] She assessed that plaintiff had met most of her expectations.[11] Dr. Atkinson contends that she provided a low rating for plaintiff because of his low clinical service revenues and inability to obtain research funding.[12] Dr. Atkinson stated in the performance review that:

> With the exception of his limited teaching responsibilities (less than 6 lecture hours per year), and on call supervision of non-legal autopsies for 3 months of each year (requiring approximately 8 au-

9. The form allowed only two responses regarding whether the candidate met expectations: yes or no. *See* Defendants' Exhibit 17.

10. In evaluating UPA pathologists, Dr. Atkinson considered the following criteria: (1) teaching responsibilities; (2) research responsibilities, including publication; (3) contribution to UPA revenue; (4) clinical service responsibility; (5) administrative responsibility; and (6) service to the institution. In making her evaluations, Dr. Atkinson met with other faculty members and reviewed (1) resident and medical student evaluations; (2) service activities; (3) curriculum vitae; and (4) the faculty member's initial preparation of his or her evaluation. Dr. Atkinson generally included in her evaluation, as goals for the following year, proposed activities and/or responsibilities for the physician.

11. The review form provided three performance levels: meeting expectations, meeting most expectations and meeting few expectations. Dr. Atkinson initially assessed plaintiff's performance as "meeting expectations" but then lowered the assessment to "meeting most expectations." Dr. Atkinson has completed 27 faculty reviews as president/chairperson. *See Affidavit Of Dr. Barbara Atkinson* ("*Atkinson Affidavit*") ¶ 5, Defendants' Exhibit 2. Of those, she assessed that 21 faculty members met expectations, five met most expectations and one met few expectations. *See id.*

12. Drs. Damjanov, Fishback, Powell and May have not received grants to fund research at KUMC. The record does not reveal, however, the amount of time said doctors devote to research and/or whether they have applied for grant funding.

topsies per year), [plaintiff's] principal work had been in unfunded research since 1992. As such [plaintiff's] research efforts did not provide financial or educational benefit to UPA or KUMC. [Plaintiff's] research did not support a close interaction with his colleagues or keep him acquainted with forensic pathology or other pathology procedures generating revenue.

*Atkinson Affidavit* ¶ 7, Defendants' Exhibit 2. In her deposition, Dr. Atkinson testified that she ranked plaintiff as meeting most expectations because:

> he didn't do the revision of the surgical pathology gross room manual or supervision of the residents in the gross room. He did do the autopsy attending but was not doing other clinical service activities. And his job at this point in time was to do only three months a year of autopsy and some medical student and resident teaching and he wasn't doing any clinical activity and he did not have grant support for his research.

Atkinson Depo. at 142:18–143:2, Plaintiff's Exhibit 3. Although Dr. Atkinson did not mention it at her deposition, plaintiff also performed clinical services of "[b]iopsy attending at surgical path. 6 days/month" and "[e]lectron microscopy of surgical materials." [13] Plaintiff's Exhibit 18.

As part of her review of plaintiff, Dr. Atkinson set the following goals for the next year: (1) teach five lectures; (2) teach small groups two hours per week,

unshared with another faculty member; (3) mentor two honor pathology students; (4) obtain grant funding; (5) do one week per month of surgical pathology; (6) attend autopsies three months per year; and (7) learn flow cytometry to back up Dr. Cunningham. *See* Plaintiff's Exhibit 18. Dr. Atkinson assigned plaintiff to surgical pathology and flow cytometry [14] in order to (1) reacquaint plaintiff with his colleagues; (2) improve plaintiff's skills in forensic pathology procedures; and (3) increase plaintiff's revenue production. Dr. Atkinson planned for plaintiff to re-learn surgical pathology procedures from Dr. Ossama Tawfik and to learn flow cytometry procedures from Dr. Mark Cunningham. Dr. Atkinson did not see any problem with plaintiff's research integrity or scholarship.

In March 2001, Dr. Atkinson assessed that plaintiff had met some expectations for the past year. Plaintiff met his teaching and publication goals and seemed dedicated to learning surgical pathology and flow cytometry.

From 2000 to 2002, Drs. Tawfik and Cunningham reported that plaintiff had progressed slowly in learning surgical pathology and flow cytometry procedures.[15] Dr. Tawfik opined that plaintiff's performance in surgical pathology was "substantially slower and poorer than that of most residents." *Affidavit Of Dr. Ossama Tawfik* (*"Tawfik Affidavit"*) ¶ 7, Defendants' Exhibit 8.

---

**13.** The record does not explain these clinical services.

**14.** Flow cytometry is a chemical/mechanical means of tissue analysis to classify neoplasms, primarily used in the diagnosis of cancer. *See Affidavit Of Dr. Mark Cunningham* (*"Cunningham Affidavit"*) ¶ 2, Defendants' Exhibit 3.

**15.** Plaintiff contends that he cannot admit or deny allegations regarding his performance in

surgical pathology and flow cytometry because defendants did not produce the diagnostic reports of other pathologists until three days before his memorandum was due. *See Plaintiff's Memorandum* (Doc. # 68) at 3 n. 1. Plaintiff has not sought leave to supplement his factual responses, however, nor has he presented evidence to controvert the affidavits of Drs. Tawfik and Cunningham. The Court therefore considers the information contained therein.

In a recommendation letter dated November 30, 2001, however, Dr. Tawfik recommended plaintiff for a staff position at another medical school, stating that

A few years ago we had a problem in which our surgical pathology staff left the department for political and academic reasons and I was left by myself with a huge responsibility of taking care of commitment to excellent clinical service to our patients and our clinicians. A monumental task that was almost impossible to accomplish without the help of capable individuals on your team. At that time I called on [plaintiff] for his help. Without hesitation, the good man was there for me. Despite his 20 years' [sic] of absence from the surgical pathology arena, he learned quickly and re-tooled his surgical pathology skills. Gradually over a short period he was signing out all the difficult and challenging cases and became a pro in a short time.

Exhibit E to *Affidavit Of Tatsuo Tomita*, Plaintiff's Exhibit 2.

In 2001, Dr. Ralph Powell mis-diagnosed a biopsy tissue as anaplastic large cell lymphoma, which Dr. Cunningham erroneously confirmed. When the patient did not respond to treatment for lymphoma, the oncologist requested a re-diagnosis. Upon reviewing the slides which Drs. Powell and Cunningham had viewed, plaintiff correctly diagnosed nasopharygeal carcinoma.

According to Dr. Cunningham, by March 2002 plaintiff functioned at the level of a senior resident in flow cytometry. *See Cunningham Affidavit* ¶ 3, Defendants' Exhibit 3. He could recognize a benign disease process and could usually recognize a malignant tumor, but he required assistance with classifying malignant tumors. In April 2002, plaintiff missed two significant diagnoses. In addition, technologists frequently had difficulty compiling plaintiff's reports due to his lack of fluency in English and numerous spelling errors.

From May 15, 2000 to the present, Dr. May has supervised the physicians who performed autopsies.[16] Dr. May testified that the number of autopsies varies and that plaintiff's autopsy reports were accurate. *See* May Depo. at 8:20–23, 17:23, Plaintiff's Exhibit 4. Dr. May also testified that all pathologists in the department make diagnostic errors at some point in time, but that she is not aware of any by plaintiff. *See id.* at 43:20–23, 41:22–42:2. Dr. Atkinson, on the other hand, testified that Drs. Cunningham, May and Powell did not make diagnostic errors but that plaintiff did. *See* Atkinson Depo. at 101:21–22, 122:10–11, 134:9–10, 138:6–7, 146:17–22, Plaintiff's Exhibit 3.

In 2002, Dr. James Cook, a hematologist, complained that Dr. Damjanov had mis-diagnosed a lymphoma/leukemia.

### B. Other Physicians' Performance

#### 1. Dr. Cunningham

In April 2000, Dr. Atkinson evaluated that Dr. Cunningham had met all expectations for the past year. As a goal for the following year, Dr. Atkinson planned for Dr. Cunningham to publish nine chapters on a disease-related website. Dr. Atkinson does not know whether Dr. Cunningham fulfilled the goal.

In March 2001, Dr. Atkinson again ranked that Dr. Cunningham had met all expectations for the past year. As a goal for the following year, Dr. Atkinson planned for Dr. Cunningham to publish

---

**16.** Dr. May, director of regional autopsy and forensic service at the University of Kansas School of Medicine, is in charge of assigning physicians to the autopsy on-call schedule. Dr. May testified that she has assigned the same schedule to all participating physicians.

four invited articles and two peer reviewed scientific articles. Dr. Cunningham did not meet this goal. Instead, he published one invited article and one peer reviewed article.[17]

In April 2002, again assessed that Dr. Cunningham had met all expectations for the past year.

## 2. Dr. Fishback

In March 2001, Dr. Atkinson evaluated that Dr. Fishback had met some expectations during the past year. As goals for the following year, Dr. Atkinson planned for Dr. Fishback to put together a work plan to revise a course website and to write at least two articles. Dr. Fishback did not fully meet the website goal. Dr. Atkinson does not know whether he wrote two articles.[18] In March 2002, Dr. Atkinson assessed that Dr. Fishback had met all expectations during the past year.

## 3. Dr. May

Autopsy reports should be issued within 30 days, but all pathologists issue reports beyond 30 days. Dr. May issues her reports the latest of all UPA physicians.

In March 2001, Dr. Atkinson evaluated that Dr. May had met all expectations for the past year. As a goal for the following year, Dr. Atkinson planned for Dr. May to publish at least one article in a peer review scientific journal. Dr. May did not meet

this goal.[19] In March 2002, Dr. Atkinson assessed that Dr. May had met all expectations for the past year.

## 4. Dr. Patterson

In March 2001, Dr. Atkinson evaluated that Dr. Patterson had met all expectations for the past year. As goals for the following year, Dr. Atkinson planned for Dr. Patterson to (1) begin to plan how to get more lab medicine into the undergraduate curriculum; (2) write and send in grant proposal for rapid chest pain evaluation; and (3) submit and publish papers. Dr. Patterson did not meet these goals.[20] In March 2002, Dr. Atkinson assessed that Dr. Patterson had met all expectations for the past year.

In 2001 and 2002, Dr. Patterson did not do as many sign-outs as other faculty members.[21]

## 5. Dr. Powell

In April 2000, Dr. Atkinson evaluated that Dr. Powell had met all expectations for the past year. As a goal for the following year, Dr. Atkinson planned for Dr. Powell to explore some additional collaborations, possibly with the pulmonary group. Dr. Powell did not meet this goal.[22]

In March 2001, Dr. Powell reported that he had one manuscript in press and three manuscripts in preparation. *See* Plaintiff's

17. Dr. Atkinson also set other goals for Dr. Cunningham in 2000 and 2001, see Plaintiff's Exhibits 5 and 6, but the record does not indicate whether Dr. Cunningham met them.

18. Dr. Atkinson also set other goals for Dr. Fishback, see Plaintiff's Exhibit 8. The record does not indicate whether Dr. Fishback met them.

19. Dr. Atkinson also set other goals for Dr. May, see Plaintiff's Exhibit 10, but the record does not indicate whether Dr. May met them.

20. Dr. Atkinson also set other goals for Dr. Patterson, see Plaintiff's Exhibit 12, but the record does not indicate whether Dr. Patterson met them.

21. The record does not reveal the meaning of sign-outs.

22. Dr. Atkinson also set other goals for Dr. Powell, see Plaintiff's Exhibit 14, but the record does not indicate whether Dr. Powell met them.

Exhibit 15. Dr. Atkinson assessed that Dr. Powell had met all expectations for the past year.

In March 2002, Dr. Powell stated that he had completed one manuscript and that he had one manuscript accepted for publication and one manuscript in preparation. *See* Plaintiff's Exhibit 16. Dr. Atkinson assessed that Dr. Powell had met all expectations for the past year. Dr. Atkinson did not know whether the manuscripts listed on Dr. Powell's 2001 evaluation were the same manuscripts mentioned in his 2002 evaluation. In general, Dr. Atkinson expected someone in Dr. Powell's position to prepare one to two papers each year for publication.

### C. Salary

For the year beginning July 1, 1999 and ending June 30, 2000, plaintiff was the lowest paid pathologist at UPA.[23] Plaintiff earned $41,568.00. The other pathologists earned as follows:

| | |
|---|---|
| Dr. Barbara Atkinson | $ 50,000 |
| Dr. Ossama Tawfik | $114,982 |
| Dr. Massahiro Chiga | $ 78,692 |
| Dr. James Fishback | $ 91,649 |
| Dr. Clarke Anderson | $ 79,817 |
| Dr. John Kepes | $ 56,856 |
| Dr. Rebecca Horvat | $ 43,680 |
| Dr. Diane Persons | $ 59,998 |
| Dr. Ralph Powell | $ 52,200 |
| Dr. Karen Santacruz | $ 45,113 |
| Dr. Patricia Thomas | $ 52,569 |
| Dr. Ivan Damjanov | $133,151 |
| Dr. Mark Cunningham | $ 80,000 |

*See* Plaintiff's Exhibit 21, Schedule 3. During Dr. Atkinson's tenure as president from October 1999 to March 2002, the UPA generally did not increase physician salaries due to financial constraints.

Plaintiff contends that UPA did not return his salary to its pre-sabbatical level when he returned from sabbatical in 1994, but it did so for Dr. Fishback. From 1992 to 1996, plaintiff and Dr. Fishback earned the following salaries:

| Year | Plaintiff | Dr. Fishback |
|---|---|---|
| 1992–93 | $87,237.00 | $68,962.00 |
| 1993–94 | $22,707.00 (sabbatical) | $25,830.00 (sabbatical) |
| 1994–95 | $42,195.00 | $49,762.00 |
| 1995–96 | $39,969.00 | $97,109.00 |

### III. Analysis

Plaintiff claims that defendants discriminated against him on the basis of race and national origin by (1) failing to restore his full salary when he returned from sabbatical in 1994; (2) assigning him more clinical services than other similarly situated employees; (3) evaluating his work performance more harshly than other similarly situated employees; and (4) failing to increase his salary. Plaintiff also claims that defendants breached his employment contract by failing to evaluate him using non-discriminatory criteria and by failing to increase his salary based on performance. Finally, plaintiff contends that after he complained of discrimination, defendants retaliated against him by (1) increasing harassment towards him; (2) requiring him to perform additional clinical assignments; (3) giving him poor work evaluations; (4) humiliating and degrading him; and (5) not raising his salary commensurate with his work.

### A. Timeliness

■ Defendants assert that plaintiff's discrimination claim regarding his post-sabbatical salary is time barred under *Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002). In *Nat'l R.R.,* the Supreme Court ruled that an employee cannot recover for discrete discriminatory or retaliatory acts which occurred more than 300 days before he or she filed a charge with the Equal Employment Opportunity Commission

---

**23.** UPA paid plaintiff's salary based on a year beginning July 1 and ending June 30.

("EEOC").[24] The Court agrees that this holding prevents plaintiff from bringing a separate claim based on defendants' actions when he returned from sabbatical in 1994. Nevertheless, to the extent that plaintiff claims lingering effects of discriminatory pay, his claim constitutes "a continually recurring series of violations, each of which is separately actionable under Title VII." *Goodwin v. Gen. Motors Corp.*, 275 F.3d 1005, 1009–10 (10th Cir.2002), *cert. denied* —— U.S. ——, 123 S.Ct. 340, —— L.Ed.2d —— (2002) (citing *Bazemore v. Friday*, 478 U.S. 385, 395, 106 S.Ct. 3000, 92 L.Ed.2d 315 (1986)). In *Goodwin*, the Tenth Circuit Court of Appeals recognized that "a claim of discriminatory pay is fundamentally unlike other claims of ongoing discriminatory treatment because it involves a series of discrete, individual wrongs rather than a single and indivisible course of wrongful action." 275 F.3d at 1010 (quoting *Pollis v. New Sch. For Soc. Research*, 132 F.3d 115, 119 (2d Cir.1997)). Thus plaintiff may assert his claim for discriminatory pay. Title VII, however, limits his recovery of back pay to a period no longer than two years before he filed his charge of discrimination. *See Goodwin*, 275 F.3d at 1011; 42 U.S.C. § 2000e–5(g)(1).

## B. Discrimination Claims

The burden-shifting framework which the Supreme Court set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) applies equally to plaintiff's claims under Title VII, Section 1981 and the KAAD. *See*

*Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1225 (10th Cir.2000); *Lewis v. Std. Motor Prods., Inc.*, 203 F.Supp.2d 1228, 1233 (D.Kan.2002). Under this approach, plaintiff initially bears the burden of production to establish a prima facie case of discrimination. *See McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817. If plaintiff establishes a prima facie case, the burden shifts to defendants to articulate a facially nondiscriminatory reason for their actions. *See Reynolds v. Sch. Dist. No. 1*, 69 F.3d 1523, 1533 (10th Cir.1995). If defendants articulate a legitimate nondiscriminatory reason, the burden shifts to plaintiff to present evidence sufficient on which a reasonable jury might conclude that defendants' proffered reason is pretextual, that is, "unworthy of belief." *Beaird v. Seagate Tech., Inc.*, 145 F.3d 1159, 1165 (10th Cir.1998) (quoting *Randle v. City Of Aurora*, 69 F.3d 441, 451 (10th Cir.1995)).

Defendants contend that plaintiff cannot establish a prima facie case because he has not shown that they treated similarly situated employees differently. In *EEOC v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1195 n. 6 (10th Cir. 2000), the Tenth Circuit clarified that plaintiff is not necessarily *required* to compare himself to similarly situated co-workers to demonstrate a prima facie case. In a case like this—which does not involve termination, failure to hire, or failure to promote[25]—plaintiff may demonstrate a prima facie case by showing that (1) he belongs to a protected class; (2) he suffered an adverse employment action;

---

**24.** *Nat'l R.R.* did not involve disparate pay. Rather, plaintiff alleged discrete acts of racial discrimination and retaliation and a racially hostile work environment. *See id.*, 122 S.Ct. at 2067–68.

**25.** In cases involving termination, failure to hire, or failure to promote, plaintiff can meet

the final element by showing, respectively, that the job was not eliminated, that the position remained open and the employer continued to seek applicants, or that the position was filled. *See id.; McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817.

and (3) the adverse employment action occurred under circumstances which give rise to an inference of discrimination. *See Hysten v. Burlington N. & Santa Fe R.R. Co.,* 296 F.3d 1177, 1181 (10th Cir. July 30, 2002).[26] In this case, however, the essence of plaintiff's claim is that defendants treated him less favorably than similarly situated employees. Specifically, plaintiff alleges that defendants gave him more clinical assignments, harsher evaluations and less pay than similarly situated employees.[27] Thus a comparison to similarly situated employees is appropriate in analyzing whether plaintiff has met the elements of a prima facie case. *See id.* (ordinarily third part of prima facie test will be satisfied by proof that employer treated similarly situated employees more favorably).

Plaintiff cites no evidence that defendants treated similarly situated employees more favorably. Plaintiff does present evidence that defendants paid him the lowest salary in 1999–2000, but he has not shown that he was similarly situated to the other pathologists. More specifically, plaintiff provides no information regarding the other pathologists' duties and contributions to UPA. While plaintiff earned $41,568, the next two lowest paid physicians, Drs. Horvat and Santacruz, earned only a few thousand dollars more, $43,680 and $45,113, respectively. Meanwhile, Drs. Tawfik and Damjanov earned significantly more, $114,982 and $133,151, respectively. Plaintiff presents no evidence to explain the disparity or to show that he deserved a higher salary. Plaintiff cites evidence that other pathologists did not meet certain goals which Dr. Atkinson set in their performance evaluations, but this means nothing without information regarding their other duties and contributions to UPA. Likewise, plaintiff has not shown that defendants gave him more clinical assignments or harsher evaluations than others who were similarly situated. On this record, plaintiff has failed to establish circumstances which give rise to an inference of discrimination.

■ Moreover, even if plaintiff satisfied the elements of a prima facie case, he has not presented sufficient evidence of pretext. Defendants articulate a facially non-discriminatory reason for their actions—that plaintiff contributed less to UPA than other pathologists. In order to avoid summary judgment, plaintiff would have to present evidence from which a reasonable jury might conclude that defendants' proffered nondiscriminatory reason is pretextual, that is, "unworthy of belief." *Beaird,* 145 F.3d at 1165 (quoting *Randle,* 69 F.3d at 451). Evidence of pretext may take a variety of forms. *See Aramburu v. Boeing Co.,* 112 F.3d 1398, 1411 n. 10 (10th Cir.

---

**26.** *Hysten* involved a discriminatory suspension claim. After *Horizon* but before *Hysten,* the Tenth Circuit twice required plaintiffs to show that defendants had treated them differently than similarly situated employees to establish a prima facie case of disparate pay. *See Goodwin,* 275 F.3d at 1012; *Lewis v. Okla. ex rel. Bd. Of Regents For Tulsa Comm. Coll.,* No. 01–5003, 2002 WL 1316810, at *3 (10th Cir. June 18, 2002). The Court uses the *Hysten* prima facie standard because the Tenth Circuit decided *Hysten* after *Goodwin* and *Lewis* and because the broad language in *Hysten* easily encompasses a disparate pay claim. As a practical matter, however, the

Court would reach the same result under either prima facie standard.

**27.** Defendants do not raise the issue, but the Court doubts that plaintiff's allegations regarding clinical assignments and harsh performance evaluations constitute adverse employment actions. *See Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 761, 118 S.Ct. 2257, 141 L.Ed.2d 633, (1998) (adverse employment action requires significant change in employment status); *Sanchez v. Denver Pub. Schs.,* 164 F.3d 527, 532 (10th Cir.1998) (mere inconvenience or alteration of job responsibilities not adverse employment action).

1997). Plaintiff can show pretext by pointing to "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could rationally find them unworthy of credence." *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir.1997) (quotations omitted). Typically, a plaintiff demonstrates pretext with evidence that (1) defendants' stated reason for the adverse action was false; (2) defendants acted contrary to written company policy prescribing the action to be taken by the defendant under the circumstances; or (3) defendants acted contrary to an unwritten policy or contrary to company practice when making the adverse decision. *See Kendrick*, 220 F.3d at 1230.

Here, plaintiff presents no evidence of pretext. He emphasizes that Dr. Atkinson began giving him harsher evaluations and more clinical assignments in 1999, although the scope of his duties had not significantly changed over the past ten years and his past supervisors had rated his performance satisfactorily. Plaintiff, however, fails to show that the stated reasons for Dr. Atkinson's actions—that plaintiff contributed less to UPA than other pathologists—is false. As discussed above, plaintiff gives no facts which compare his contributions to UPA to that of other pathologists. Plaintiff's argument regarding disparate pay is even more tenuous. His pay remained virtually unchanged from 1994 to 2002. The crux of his claim appears to be that UPA paid Dr. Fishback more in the years following his sabbatical. Again, plaintiff provides no information regarding Dr. Fishback's duties and contributions to UPA during this time. In short, plaintiff provides no evidence that defendants' stated reason is false or that defendants acted contrary to company

policy or practice. Thus, plaintiff has failed to present sufficient evidence of pretext.

## C. Breach of Contract

Defendants assert that as a matter of law, plaintiff cannot maintain a breach of contract claim. *See Defendants' Memorandum* at 22–23. More specifically, defendants assert that plaintiff's employment contract does not address non-discriminatory evaluation criteria, clinical service assignment or pay, and that Kansas law does not imply a covenant of good faith and fair dealing in employment contracts. *See id.* at 23 (citing *Morriss v. Coleman Co.*, 241 Kan. 501, 514–15, 738 P.2d 841 (1987) and *Kan. Baptist Convention v. Mesa Operating, Ltd. P'ship*, 253 Kan. 717, 864 P.2d 204 (1993)). Plaintiff does not respond to this argument. Defendants are therefore entitled to summary judgment on plaintiff's breach of contract claim.

## D. Retaliation

Defendants' motion does not address plaintiff's retaliation claims. Those claims therefore remain in the case.

**IT IS THEREFORE ORDERED** that the *Motion For Summary Judgment By University Pathology Association And Barbara Atkinson, M.D.* (Doc. # 57) filed June 14, 2002 be and hereby is SUSTAINED. The Court grants summary judgment in favor of defendants on plaintiff's claims for discrimination and breach of contract. Plaintiff's retaliation claims remain in the case.[28]

---

**28.** As noted above, plaintiff contends that af-

ter he complained of discrimination, defen-