**Laura INGLIS, Susanne Gubanc, Nadine Brewer, Hollace Drake, Robbie Ludy, and Ann Petersen, Plaintiffs,**

v.

**BUENA VISTA UNIVERSITY, Defendant.**

**No. C00–4150–MWB.**

United States District Court,
N.D. Iowa,
Western Division.

Dec. 16, 2002.

Tiffany Basantz Klosener, Roxanne Conlin & Associates, Des Moines, IA, for plaintiff.

Gary W. Armstrong, Mack, Hansen, Gadd, Armstrong & Brown, PC, Storm Lake, IA, Daniel Wilczek, Kristen M. Ludgate, Faegre & Benson, Minneapolis, MN, for defendant.

MEMORANDUM OPINION AND ORDER REGARDING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND REGARDING PLAINTIFF INGLIS'S MOTION TO SUBSTITUTE

BENNETT, Chief Judge.

## TABLE OF CONTENTS

I. *BACKGROUND* .................................................. 1013

II. *DISCUSSION* .................................................. 1015
 A. *Summary Judgment Standards* .......................................... 1015
 1. *Requirements of Rule 56* ......................................... 1015
 2. *The parties' burdens* ........................................... 1016
 3. *Summary judgment in employment discrimination cases* ............. 1016
 B. *Are the Plaintiffs' Claims Time–Barred?* ............................. 1018
 1. *Pay claims prior to* Morgan ...................................... 1020
 2. *The* Morgan *decision* ........................................... 1022
 3. *Application of* Morgan *to pay claims* ........................... 1024
 C. *Motion to Substitute* ............................................... 1029

III. *CONCLUSION* ................................................. 1030

This matter comes before the court on the defendant's Motion For Summary Judgment (Doc. No. 38), filed September 1, 2002. The plaintiffs resisted the defendant's motion on October 16, 2002, and the court heard oral argument on December 3, 2002. At this hearing, the plaintiffs were represented by Tiffany Basantz Klosener of Roxanne Conlin & Associates, Des Moines, Iowa, and the defendant was rep-

resented by Daniel Wilczek, of Faegre & Benson, Minneapolis, Minnesota, and Gary Armstrong, of Mack, Hansen, Gadd, Armstrong, & Brown, of Storm Lake, Iowa. The lawyers were extremely well prepared and presented insightful arguments. As a result, the court invited supplemental briefing. All parties accepted this invitation. This wage discrimination case is currently set for a jury trial to begin on February 10, 2003.

## I. BACKGROUND

The plaintiffs are professors and former professors at Buena Vista University ("BVU"). The defendant in this action, BVU, is a private university located in Storm Lake, Iowa. The plaintiffs allege that, during the course of their employment at BVU, they were paid less than similarly situated males because of their sex. The plaintiffs seek redress for the alleged wage discrimination at BVU pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., the Iowa Civil Rights Act ("ICRA"), Iowa Code § 216, and the Equal Pay Act ("EPA"), 29 U.S.C. § 255. Each plaintiff filed an administrative charge with the EEOC and Iowa Civil Rights Commission on September 1, 1999 and, upon receiving right-to-sue letters, timely commenced their lawsuits on November 6, 2000.[1]

The following chart briefly summarizes the employment history of the plaintiffs at BVU:

| Plaintiff | Degree | Year Hired | Beginning Rank | Promotions/ Year | School | Discipline |
|---|---|---|---|---|---|---|
| Laura Inglis[2] | Ph.D. | 1987 | Assistant Professor | Associate Professor (1991) | Social Science, Philosophy & Religion | Religion, Philosophy |
| Susanne Gubanc | Master | 1994 | Assistant Professor | Promotion or tenure not sought | Communication & Arts | Mass Communications |
| Nadine Brewer | Master | 1987 | Assistant Professor | Associate Professor (1992); Full Professor (1999) | Communication & Arts | English |
| Hollace Drake | Master | 1985 | Instructor | Assistant Professor (1987) | Communication & Arts | English/Speech |
| Robbie Ludy | Ph.D. | 1996 | Associate Professor | Full Professor (2001) | Education | Education |
| Ann Petersen | Ph.D. | 1990 | Assistant Professor | Associate Professor (1996) | Education | Education |

At BVU, the Vice President for Academic Affairs ("VPAA") is primarily responsible for oversight of the curriculum, faculty hiring and evaluations, tenure and promotion decisions, and the academic budget. In addition, the VPAA makes faculty compensation decisions, though these decisions are subject to BVU's president's revisions and approval. In the summer of 1997, John Mouw, Director of the Graduate School, was appointed as acting VPAA. As VPAA, Mouw prepared a statistical analysis of faculty salaries at BVU

---

1. The six plaintiffs instituted separate complaints on November 6, 2000. In an order dated March 21, 2002 (Doc. No. 34), this court consolidated the plaintiffs' actions into one.

2. Professor Laura Inglis passed away on August 14, 2001.

and found that some variation in salaries remained unexplained by his model, which looked to the average salary in the market, salaries at peer institutions, and experience. Mouw did not attempt to identify the source of the variations but suggested that gender and ethnicity differences should be explored further.

In 1998, BVU hired Dr. Karen Halbersleben to replace Mouw as the VPAA. Prior to Halbersleben's arrival at BVU, the university had retained the consulting firm of McGladrey & Pullen to conduct analyses of BVU's compensation practices. One of the objectives of the McGladrey study was to conduct an "open and transparent salary and administration process, which would include a review of salaries currently paid to BV faculty, and to benchmark those salaries against a defined group of peer and aspirant institutions." [Halbersleben Dep. 99, Pl.'s App., at 132]. While the McGladrey study was pending, BVU suspended all individualized pay increases to faculty members in 1998, 1999, 2000, and 2001.[3]

As part of the McGladrey study, gender and age were included as variables. The preliminary results of the study showed that there existed a potential correlation between pay and gender at BVU, and these results were presented to the faculty in April of 1999. As a result of the troubling findings, McGladrey & Pullen performed a more in-depth faculty pay analysis that involved a multiple regression analysis of BVU's pay practices. The regression analysis ultimately indicated that gender was not a statistically significant predictor of faculty salaries. However, the findings were based, in part, on incorrect data and, therefore, are not altogether reliable. Namely, the McGladrey & Pullen

firm misclassified plaintiff Ludy and another female professor as "male" faculty members, thus understating the average male faculty salary while simultaneously increasing the average female faculty salary.

Nevertheless, BVU determined that some of the salary disparities in faculty pay were unwarranted and attempted to utilize the McGladrey study results to establish market-based salary "floors." Accordingly, in July of 1999, BVU ultimately increased the salaries of 20 male and 11 female faculty members. All six plaintiffs received salary increases as a result of the implementation of these McGladrey adjustments.

Wholly apart from the McGladrey adjustments, however, plaintiffs Drake and Gubanc, as well as a third professor, David Walker, received lump sum payments. These payments were aimed at correcting past salary disparities created during Halbersleben's tenure at BVU. However, by Halbersleben's own admission, the pay adjustments were not intended to remedy nor refer to any gender issues in pay disparities. [Halbersleben Dep., 134–37; Pf.'s App., at 133]. Instead, Halbersleben determined that these payments were warranted because, since her arrival as VPAA, she had hired a new faculty member at a higher salary than the three comparable BVU incumbents. Drake received a lump sum adjustment of $14,172, and Gubanc received $13,831. As a condition of receiving the lump sum payments, the recipients, Drake, Gubanc, and Walker, were required to sign agreements, which stated that "This Agreement is intended to be a full agreement of the parties regarding salary equity issues from 1998 up to and includ-

---

**3.** No individualized pay increases were awarded, apart from a lump sum payment given to four faculty members, including plaintiffs Drake and Gubanc, in 1999 and to five faculty members in 2001, four of which were given to maintain internal equity, while the fifth was an increase awarded to a professor after obtaining her Ph.D.

ing the date of this Agreement, and including the 1999–2000 academic year." [Deft.'s App, at 652–53].

After confronting BVU after the April of 1999 presentation of the initial McGladrey & Pullen study findings, arguing that their salaries were lower than their male counterparts and that this disparity was the result of gender discrimination, the plaintiffs filed substantially identical administrative charges against BVU, alleging that BVU discriminated against them in pay and related benefits on the basis of sex. This lawsuit followed.

## II. DISCUSSION

In this action, the plaintiffs do not challenge BVU's current compensation system. Instead, they challenge the previous system, which BVU eliminated in July of 1999 with the McGladrey adjustments. As a consequence, BVU argues that the plaintiffs' claims are barred by the statutes of limitations applicable to each of their claims. The plaintiffs, however, resist this argument, asserting that their claims include a pattern and practice of discriminatory conduct and that their claims are timely because the practice of discrimination extended into the limitations period. Furthermore, they urge the court to find that even their claims of pay discrimination pre-dating the 1998–1999 academic year are timely because the pre–1998 pay disparities formed part of the continuing violation of sex discrimination practiced by the defendant during the limitations period.

In addition, BVU asserts that plaintiffs Drake and Gubanc have released any salary equity claims that may have arisen during the limitations period by signing the release agreements associated with their respective lump sum salary adjustment payments. And finally, BVU contends that, even if the plaintiffs' claims are not time-barred, their pay discrimination claims are insufficient as a matter of law because (1) they cannot show any "similarly situated" male faculty members who were paid more and (2) even if they have identified valid comparators, any pay disparities were based on factors other than sex. The court will address these arguments in turn.

### A. Summary Judgment Standards

This court has considered in some detail the standards applicable to motions for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure in a number of prior decisions. *See, e.g., Swanson v. Van Otterloo*, 993 F.Supp. 1224, 1230–31 (N.D.Iowa 1998); *Dirks v. J.C. Robinson Seed Co.*, 980 F.Supp. 1303, 1305–07 (N.D.Iowa 1997); *Laird v. Stilwill*, 969 F.Supp. 1167, 1172–74 (N.D.Iowa 1997); *Rural Water Sys. # 1 v. City of Sioux Ctr.*, 967 F.Supp. 1483, 1499–1501 (N.D.Iowa 1997), *aff'd in pertinent part*, 202 F.3d 1035 (8th Cir.), *cert. denied*, 531 U.S. 820, 121 S.Ct. 61, 148 L.Ed.2d 28 (2000); *Tralon Corp. v. Cedarapids, Inc.*, 966 F.Supp. 812, 817–18 (N.D.Iowa 1997), *aff'd*, 205 F.3d 1347, 2000 WL 84400 (8th Cir.2000) (Table op.); *Security State Bank v. Firstar Bank Milwaukee, N.A.*, 965 F.Supp. 1237, 1239–40 (N.D.Iowa 1997); *Lockhart v. Cedar Rapids Cmty. Sch. Dist.*, 963 F.Supp. 805 (N.D.Iowa 1997). The essentials of these standards for present purposes are as follows.

### 1. Requirements of Rule 56

Rule 56 provides, in pertinent part, that "[a] party against whom a claim . . . is asserted . . . may, at any time, move for summary judgment in the party's favor as to all or any part thereof." Fed.R.Civ.P. 56(b). Further,

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits,

if any, show that there is *no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.*

Fed.R.Civ.P. 56(c) (emphasis added).

Applying these standards, the trial judge's function at the summary judgment stage of the proceedings is not to weigh the evidence and determine the truth of the matter, but rather is to determine whether there are genuine issues for trial. *Quick v. Donaldson Co.*, 90 F.3d 1372, 1376–77 (8th Cir.1996); *Johnson v. Enron Corp.*, 906 F.2d 1234, 1237 (8th Cir.1990). An issue of material fact is genuine if it has a real basis in the record. *Hartnagel v. Norman*, 953 F.2d 394 (8th Cir.1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)); *accord Lockhart v. Cedar Rapids Comm. Sch. Dist.*, 963 F.Supp. 805, 814 n. 3 (N.D.Iowa 1997) (citing *Matsushita*, 475 U.S. at 586–87, 106 S.Ct. 1348). As to whether a factual dispute is "material," the Supreme Court has explained, "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *accord Rouse v. Benson*, 193 F.3d 936, 939 (8th Cir. 1999).

### 2. The parties' burdens

Procedurally, the moving party bears the initial responsibility of informing the court of the basis for its motion and identifying the portions of the record showing a "lack of a genuine issue." *Hartnagel*, 953 F.2d at 395 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)); *see also Rose–Maston v. NME Hospitals, Inc.*, 133 F.3d 1104, 1107 (8th Cir.1998). When this burden is met, the party opposing summary judgment "must do more than simply show

there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586, 106 S.Ct. 1348. Instead, the opposing party is required to go beyond the pleadings and, by either affidavits or the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548; *Rabushka ex. rel. United States v. Crane Co.*, 122 F.3d 559, 562 (8th Cir.1997). If the opposing party fails to make a sufficient showing of an essential element of a claim for which that party has the burden of proof, then the movant is "entitled to judgment as a matter of law." *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548; *In re Temporomandibular Joint (TMJ) Implants Prod. Liab. Litig.*, 113 F.3d 1484, 1492 (8th Cir.1997). In considering a motion for summary judgment, the court must view all the facts in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences that can be drawn from the facts. *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348; *Quick*, 90 F.3d at 1377.

### 3. Summary judgment in employment discrimination cases

Because this is an employment discrimination case, it is well to remember that the Eighth Circuit Court of Appeals has cautioned that "summary judgment should seldom be used in employment-discrimination cases." *Crawford v. Runyon*, 37 F.3d 1338, 1341 (8th Cir.1994) (citing *Johnson v. Minnesota Historical Soc'y*, 931 F.2d 1239, 1244 (8th Cir.1991); *Hillebrand v. M–Tron Indus., Inc.*, 827 F.2d 363, 364 (8th Cir.1987), *cert. denied*, 488 U.S. 1004, 109 S.Ct. 782, 102 L.Ed.2d 774 (1989)); *see also Snow v. Ridgeview Medical Ctr.*, 128 F.3d 1201, 1205 (8th Cir.1997) (citing *Crawford* ); *Helfter v. United Parcel Serv., Inc.*, 115 F.3d 613, 615 (8th Cir.1997)

(quoting *Crawford*); *Chock v. Northwest Airlines, Inc.*, 113 F.3d 861, 862 (8th Cir. 1997) ("We must also keep in mind, as our court has previously cautioned, that summary judgment should be used sparingly in employment discrimination cases," citing *Crawford*); *Smith v. St. Louis Univ.*, 109 F.3d 1261, 1264 (8th Cir.1997) (quoting *Crawford*); *Hardin v. Hussmann Corp.*, 45 F.3d 262, 264 (8th Cir.1995) ("[S]ummary judgments should only be used sparingly in employment discrimination cases.") (citing *Haglof v. Northwest Rehabilitation, Inc.*, 910 F.2d 492, 495 (8th Cir. 1990); and *Hillebrand*, 827 F.2d at 364). Summary judgment is appropriate in employment discrimination cases only in "those rare instances where there is no dispute of fact and where there exists only one conclusion." *Johnson*, 931 F.2d at 1244; *see also Webb v. St. Louis Post–Dispatch*, 51 F.3d 147, 148 (8th Cir.1995) (quoting *Johnson*, 931 F.2d at 1244); *Crawford*, 37 F.3d at 1341 (quoting *Johnson*, 931 F.2d at 1244). To put it another way, "[b]ecause discrimination cases often depend on inferences rather than on direct evidence, summary judgment should not be granted unless the evidence could not support any reasonable inference for the nonmovant." *Crawford*, 37 F.3d at 1341; *accord Snow*, 128 F.3d at 1205 ("Because discrimination cases often turn on inferences rather than on direct evidence, we are particularly deferential to the nonmovant.") (citing *Crawford*, 37 F.3d at 1341); *Webb v. Garelick Mfg. Co.*, 94 F.3d 484, 486 (8th Cir.1996) (citing *Crawford*, 37 F.3d at 1341); *Wooten v. Farmland Foods*, 58 F.3d 382, 385 (8th Cir.1995) (quoting *Crawford*, 37 F.3d at 1341); *Johnson*, 931 F.2d at 1244.

Nevertheless, the Eighth Circuit Court of Appeals also observed that "[a]lthough summary judgment should be used sparingly in the context of employment discrimination cases, *Crawford v. Runyon*, 37 F.3d 1338, 1341 (8th Cir.1994), the plaintiff's evidence must go beyond the establishment of a prima facie case to support a reasonable inference regarding the alleged illicit reason for the defendant's action." *Landon v. Northwest Airlines, Inc.*, 72 F.3d 620, 624 (8th Cir.1995) (citing *Reich v. Hoy Shoe Co.*, 32 F.3d 361, 365 (8th Cir.1994)); *accord Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1134 (8th Cir.) (observing that the burden-shifting framework of *McDonnell Douglas* must be used to determine whether summary judgment is appropriate), *cert. denied*, 528 U.S. 818, 120 S.Ct. 59, 145 L.Ed.2d 51 (1999). More recently, in *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000), the Supreme Court reiterated that " '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.' " *Reeves*, 530 U.S. at 142, 120 S.Ct. 2097 (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)).[4] Thus, what the plaintiff's evidence must show, to avoid summary judgment or judgment as a matter of law, is " '1, that the stated reasons were not the real reasons for [the plaintiff's] discharge; and 2, that age [or race, or sex, or other prohibited] discrimination was the real reason for [the plaintiff's] discharge." *Id.* at 153, 120 S.Ct. 2097 (quoting the district court's jury instructions as properly stat-

---

**4.** In *Reeves,* the Supreme Court was considering a motion for judgment as a matter of law after a jury trial, but the Supreme Court also reiterated that "the standard for granting summary judgment 'mirrors' the standard for judgment as a matter of law, such that 'the

inquiry under each is the same.' " *Reeves,* 530 U.S. at 150, 120 S.Ct. 2097 (quoting *Liberty Lobby, Inc.,* 477 U.S. at 250–51, 106 S.Ct. 2505). Therefore, the standards articulated in *Reeves* are applicable to the present motion for summary judgment.

ing the law). The Supreme Court clarified in *Reeves* that, to meet this burden, "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Id.* at 148, 120 S.Ct. 2097. The court will apply these standards to the defendant's motion for summary judgment, addressing each of the disputed issues in turn.

### B. Are the Plaintiffs' Claims Time–Barred?

The EPA prohibits sex discrimination and provides as follows:

No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working condi-

tions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex[.]

29 U.S.C. § 206(d)(1).

▮▮▮▮ "Where a claim is for unequal pay for equal work based upon sex, the standards of the Equal Pay Act apply whether the suit alleges a violation of the Equal Pay Act or of Title VII." *McKee v. Bi–State Development Agency*, 801 F.2d 1014, 1018–19 (8th Cir.1986) (citing *Orahood v. Board of Trustees*, 645 F.2d 651, 654 n. 3 (8th Cir.1981)); *accord Simmons v. New Pub. Sch. Dist. No. Eight*, 251 F.3d 1210, 1215 (8th Cir.2001) ("[W]hen a plaintiff alleges that her employer provides 'unequal pay for equal work on the basis of sex, the standards are the same whether the plaintiff proceeds under Title VII or the Equal Pay Act.' ") (quoting *Kindred v. Northome/Industrial Sch. Dist. No. 363*, 154 F.3d 801, 803 (8th Cir.1998)). The same standards also apply to pay claims brought pursuant to the ICRA.[5] *See Vivi-*

---

**5.** In considering a plaintiff's discrimination claims brought pursuant to federal law and comparable state-law claims, the court generally makes no distinction between them. This is appropriate because the Iowa Supreme Court has recognized that federal precedent is applicable to discrimination claims under the ICRA, IOWA CODE CH. 216. *See Vivian v. Madison*, 601 N.W.2d 872, 873 (Iowa 1999) ("The ICRA was modeled after Title VII of the United States Civil Rights Act."); *cf. Fuller v. Iowa Dep't of Human Servs.*, 576 N.W.2d 324, 329 (Iowa 1998) (recognizing that Chapter 216's prohibition on disability discrimination is the state-law "counterpart" to the ADA, and that, "[i]n considering a disability discrimination claim brought under Iowa Code chapter 216, we look to the ADA and cases interpreting its language. We also consider the underlying federal regulations established by the Equal Employment Opportunity Commission (hereinafter 'EEOC'), the agency responsible

for enforcing the ADA.") (internal citations omitted). Iowa courts, therefore, traditionally turn to federal law for guidance in evaluating the ICRA. *King v. Iowa Civil Rights Comm'n*, 334 N.W.2d 598, 601 (Iowa 1983).

Federal law, however, is not controlling. Iowa courts look simply to the analytical framework utilized by the federal courts in assessing federal law, and federal courts must not substitute the language of the federal statutes for the clear words of the ICRA. *Hulme v. Barrett*, 449 N.W.2d 629, 631 (Iowa 1989); *accord Board of Supervisors of Buchanan County v. Iowa Civil Rights Comm'n*, 584 N.W.2d 252, 256 (Iowa 1998) ("In deciding gender discrimination disputes, we adhere to the Title VII analytical framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04, 93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668, 677–79 (1973)") (citing *Hy–Vee Food Stores, Inc. v. Iowa Civil Rights Comm'n*, 453 N.W.2d 512, 516 (Iowa 1990)).

*an v. Madison,* 601 N.W.2d 872, 873 (Iowa 1999). Therefore, in discussing the plaintiffs' discrete wage discrimination claims, the court will combine its analyses and apply one uniform standard to each claim—that developed under the EPA.

■ A successful gender-based wage discrimination claim requires the plaintiff to prove that her employer pays different wages to employees of opposite sexes "for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." *Corning Glass Works v. Brennan,* 417 U.S. 188, 195, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974) (Equal Pay Act); *see also EEOC v. Delight Wholesale Co.,* 973 F.2d 664, 669 (8th Cir. 1992) (holding that same standard applies to Equal Pay Act and Title VII wage-discrimination claims). Once the plaintiff has proven her *prima facie* case, the employer then bears the burden of coming forward with a legitimate nondiscriminatory factor upon which it based the wages paid. *See* 29 U.S.C. § 206(d)(1); *Hutchins v. International Bhd. of Teamsters,* 177 F.3d 1076, 1080–81 (8th Cir.1999).

However, before addressing the merits of the plaintiffs' wage claims, the court must first consider BVU's argument that the claims are time-barred. As a general matter, actionable incidents of sexual discrimination in a deferral state, such as Iowa, are those that occur within 300 days of filing a complaint with the EEOC. *See* 42 U.S.C. § 2000e–5(e)(1). The ICRA is stricter and limits the filing period to 180 days after the alleged unlawful incident occurred. Iowa Code § 216.15(12). The EPA requires the commencement of a civil action within two years of the accrual of a cause of action for non-willful violations. 29 U.S.C. § 255(a). Here, the plaintiffs filed their administrative charges on Sep-

tember 1, 1999 and commenced their lawsuits on November 6, 2000. Therefore, the relevant "cut-off" dates for legally significant conduct that can be considered under the plaintiffs' wage discrimination claims are:

| | |
|---|---|
| Title VII | November 5, 1998 |
| Equal Protection Act | November 6, 1998 [6] |
| Iowa Civil Rights Act | March 5, 1999 |

The fighting issue in this summary judgment motion centers on these dates, which all parties concede are the correct jumping off points in this case. The plaintiffs' claims of wage discrimination are based on their starting wages, which they allege were lower than their male counterparts' starting salaries, as well as on their annual merit increases, which were governed by allegedly unlawful and subjective standards. Complicating this matter is the fact that BVU suspended all individualized merit wage increases in the fall of 1997. Following 1997 and continuing until May of 1999, the only raises awarded to BVU faculty were cost of living adjustments and uniform across-the-board merit increases given to all faculty. When the McGladrey study was completed in 1999, BVU established faculty pay "standards" and initiated its current compensation system, which is based on those standards.

■ The plaintiffs do not challenge the current system. Instead, they challenge the former compensation system. Because the prior pay structure was suspended in 1997, BVU argues that the plaintiffs' claims are time-barred. The plaintiffs invoke the "continuing violations" theory and argue that, because they received paychecks allegedly tainted by discrimination up until BVU's current compensation system was instituted in May of 1999, their claims fall within the limitations periods. BVU disagrees and argues that the pay

---

**6.** For willful violations, the EPA requires that a civil action be brought within three years of the after a cause of action accrues. 29 U.S.C. § 255(a).

received by the plaintiffs after the fall of 1997 and before May of 1999, at most, represents a lingering effect of past discrimination, which does not function to revive the limitations period.

### 1. Pay claims prior to Morgan

Had this motion come before the court before the Supreme Court's decision in *National R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002), this case would not present a particularly difficult issue. This is so because both Supreme Court and Eighth Circuit pre-*Morgan* precedent regarding pay claims, read together, would appear to dictate a conclusion that pay claims are continuing violations of Title VII because each gender-based discriminatory salary payment constitutes a fresh Title VII violation. To illustrate why pre-*Morgan* precedent would compel this result, the court will briefly summarize pre-*Morgan* treatment of pay claims.

In *Bazemore v. Friday,* 478 U.S. 385, 106 S.Ct. 3000, 92 L.Ed.2d 315 (1986),[7] the United States Supreme Court addressed a pattern-and-practice racial pay discrimination case. In *Bazemore,* the North Carolina Agricultural Extension Service ("Extension Service"), prior to August 1, 1965, maintained a racially segregated system of employment and of providing services. When the Extension Service became subject to Titles VI and VII, it integrated its branches, but the unification " 'did not result immediately in the elimination of some disparities which had existed between the salaries of white personnel and black personnel. . . .' " *Id.* at 391, 106 S.Ct.

3000 (quoting district court opinion) (omission provided by *Bazemore* Court). Post-integration, black employees still earned less than white employees. *Id.*

The Extension Service argued that it had no duty to eliminate pay disparities that had their origins prior to 1972 when Title VII became applicable to public employers such as the Extension Service. *Id.* at 394, 106 S.Ct. 3000. The Supreme Court disagreed and held "that the Extension Service discriminated with respect to salaries *prior* to the time it was covered by Title VII does not excuse perpetuating that discrimination *after* the Extension Service became covered by Title VII." *Id.* at 395, 106 S.Ct. 3000.

Most pertinent to the Inglis plaintiffs' case, the Court held that "Each week's paycheck that delivers less to a black than to a similarly situated white is a wrong actionable under Title VII, regardless of the fact that this pattern was begun prior to the effective date of Title VII." *Id.* at 395–96, 106 S.Ct. 3000. Under *Bazemore,* then, a pattern of pay discrimination is viewed as a continually recurring series of violations, each of which is separately actionable under Title VII. *See id.* The Eighth Circuit extended this holding to cases in which the plaintiffs allege wage discrimination based on sex. *See Ashley v. Boyle's Famous Corned Beef Co.,* 66 F.3d 164, 168 (8th Cir.1995) (en banc).

In *Ashley,* the plaintiff alleged that gender discrimination tainted her rate of pay. *Ashley,* 66 F.3d at 167. The Eighth Circuit Court of Appeals noted that "[w]hen an employer is accused of an on-

---

**7.** *Bazemore* begins with a brief two-page per curiam opinion. *Bazemore,* 478 U.S. at 386–88, 106 S.Ct. 3000. An extended concurring-in-part opinion authored by Justice Brennan follows, and all other Justices joined in Justice Brennan's concurrence. *Id.* at 388–407, 106 S.Ct. 3000. Two other opinions conclude the array: a separate concurrence by Justice

White, written for himself and four other Justices, and a dissenting-in-part opinion by Justice Brennan, written for himself and three other Justices. The portion of *Bazemore* cited in this order is drawn entirely from Justice Brennan's concurrence, which represents a unanimous decision of the Court.

going practice that began prior to the statute of limitations period, the claim may nonetheless be timely under the 'continuing violation' doctrine." *Id.* at 167–68 (citing *Hukkanen v. International Union of Operating Eng'rs Local 101*, 3 F.3d 281, 285 (8th Cir.1993)); *accord Satz v. ITT Fin. Corp.*, 619 F.2d 738, 743–44 (8th Cir.1980) (rejecting defendant's statute of limitations argument and holding that "[t]he practice of paying discriminatorily unequal pay occurs not only when an employer sets pay levels, but as long as the discriminatory differential continues.") (citing *Corning Glass Works v. Brennan*, 417 U.S. 188, 205–10, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974)). The court held that, if a timely violation exists, the plaintiff is not barred from challenging that violation, even if similar illegal acts are not actionable because they are time-barred. *Id.* at 168. Relief in such cases, however, dates "back to the beginning of the limitations period [which] strikes a reasonable balance between permitting redress of an ongoing wrong and imposing liability for conduct long past." *Id.* at 168.

In *Ashley*, the plaintiff was allegedly subjected to discriminatory rates of pay dating back to the beginning of her employment with the defendant, several years before she initiated a lawsuit. *Id.* at 167. However, the *Ashley* court held that, while much of her discriminatory pay claim was time-barred, she was still entitled to recover for discriminatory paychecks received within the 300 days prior to the filing of her administrative charge. *Id.* at 168 (citing *Satz*, 619 F.2d at 743). Although this rule had been criticized, subsequent Eighth Circuit panels have affirmed the en banc *Ashley* court's rule. *See Kline v. City of Kansas City*, 175 F.3d 660, 665–67 (8th Cir.1999); *Kimzey v. Wal–Mart Stores, Inc.*, 107 F.3d 568, 572 (8th Cir. 1997); *Gipson v. KAS Snacktime Co.*, 83 F.3d 225, 230 (8th Cir.1996) (*Gipson I* ).

Pre-*Morgan*, the same analysis would appear to hold true for the plaintiffs' EPA claims as well. *See Ashley*, 66 F.3d at 168. In other words, the *Ashley* rule would compel the conclusion that the plaintiffs' EPA claims are timely, but recovery is limited to the statutory period. *See id.; accord Nealon v. Stone*, 958 F.2d 584, 591 n. 5, 592 (4th Cir.1992) (holding that plaintiff's EPA claim was timely because "each issuance of her paycheck at a lower wage than her male counterpart received constituted a new discriminatory action for purposes of EPA limitations accrual," but noting in a footnote that the plaintiff is limited to "recovering only those damages that accrued during the three years prior to filing suit under section 255(a) of the EPA") (citing *Hodgson v. Behrens Drug Co.*, 475 F.2d 1041, 1050–51 (5th Cir.1973)).

Indeed, prior to *Morgan*, the trend, though clearly not a universal one, was to interpret pay claims as continuing violations of Title VII, regardless of whether the plaintiff challenged a single act of wage discrimination or a discriminatory pay policy. *See, e.g., Goodwin v. General Motors Corp.*, 275 F.3d 1005, 1010 (10th Cir.) (decided six months prior to *Morgan* and holding that "[u]nder *Bazemore*, then, pay discrimination must be viewed as a continually recurring series of violations, each of which is separately actionable under Title VII."), *cert. denied*, —— U.S. ——, 123 S.Ct. 340, 154 L.Ed.2d 248 (2002); *Ashley*, 66 F.3d at 167–68 (applying continuing violations theory to pay claim); *Miller v. Beneficial Mgmt. Corp.*, 977 F.2d 834, 843 (3d Cir.1992) ("Most courts appear to treat pay discrimination claims as continuing violations.") (citing *Hall v. Ledex, Inc.*, 669 F.2d 397, 398 (6th Cir.1982)) ("Furthermore, the discrimination was continuing in nature. Hall suffered a denial of equal pay with every check she received.") (citing *Satz*, 619 F.2d at 738); *Laffey v. Northwest Airlines, Inc.*,

567 F.2d 429 (D.C.Cir.1976); *Hodgson v. Behrens Drug Co.*, 475 F.2d 1041, 1050 (5th Cir.1973)); *Satz*, 619 F.2d at 743–44 (rejecting defendant's statute of limitations argument and holding that "[t]he practice of paying discriminatorily unequal pay occurs not only when an employer sets pay levels, but as long as the discriminatory differential continues.") (citing *Corning Glass Works v. Brennan*, 417 U.S. 188, 205–10, 94 S.Ct. 2223, 41 L.Ed.2d 1) (1974)); *cf. Tomita v. University of Kan. Med. Ctr.*, 227 F.Supp.2d 1171 (D.Kan. 2002) (post-*Morgan* but citing pre-*Morgan* Tenth Circuit case for proposition that "to the extent that plaintiff claims lingering effects of discriminatory pay, his claim constitutes 'a continually recurring series of violations', each of which is separately actionable under Title VII" and permitting pay claim to go forward under continuing violations theory). *But see Dasgupta v. University of Wis. Bd. of Regents*, 121 F.3d 1138 (7th Cir.1997) (rejecting continuing violations theory on pay claim and holding that, if conduct supports a Title VII suit at the time committed, it cannot be said to be a continuing violation).

### 2. *The* Morgan *decision*

However, the Supreme Court recently limited the applicability of the continuing violations theory in *Morgan*, which casts doubt on the continued viability of lower courts' extension of *Bazemore* to all pay discrimination cases. Under Title VII, as previously noted, to be deemed timely, an EEOC charge must be filed "within three hundred days after the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e–5(e)(1). *Morgan* applies to this case insofar as it interprets the meaning of "practice" and explains when a practice "occurs" for purposes of starting the clock running for the filing of a claim.

In *Morgan*, the respondent, a black male, filed suit against his employer, petitioner Amtrak, asserting three types of claims: discrimination, hostile work environment, and retaliation. *Id.* at 2067–68. Morgan filed a charge of discrimination with the EEOC complaining of allegedly discriminatory acts which took place both within 300 days of his filing the charge and predating the limitations period. *Id.* The issue before the Court was "whether, and under what circumstances, a Title VII plaintiff may file suit on events that fall outside this statutory time period." *Id.* at 2068.

The Supreme Court reversed the Ninth Circuit's ruling and denounced the appellate court's "serial violations" interpretation of the continuing violations doctrine. *Id.* The Ninth Circuit had determined that "a plaintiff may sue on claims what would ordinarily be time barred so long as they . . . are 'sufficiently related' to incidents that fall within the statutory period." *Id.* The Supreme Court summarized its holding in *Morgan* as follows:

> We hold that the statute [Title VII] precludes recovery for discrete acts of discrimination or retaliation that occur outside the statutory time period. We also hold that consideration of the entire scope of a hostile work environment claim, including behavior alleged outside the statutory time period, is permissible for the purposes of assessing liability, so long as any act contributing to that hostile environment takes place within the statutory period. The application of equitable doctrines, however, may either limit or toll the time period within which an employee must file a charge.

*Id.*

■ In *Morgan*, the Court distinguished between discrete acts of discrimination and hostile work environment claims. *See id.* at 2073–74. Discrete acts, "such as termination, failure to promote, denial of transfer, or refusal to hire," occur on a particular day and "are easy to identi-

fy." *Id.* at 2073. Such acts "are not actionable if time barred, even when they are related to acts alleged in timely filed charges. Each discrete discriminatory act starts a new clock for filing charges alleging that act." *Id.* at 2072. Therefore, "[a]ll prior discrete discriminatory acts [that occurred outside Title VII's limitations period] are untimely filed and no longer actionable." *Id.* at 2073.

The Court based its interpretation of the term "practice" on the statutory language and legislative history of Title VII. The Court held that "[t]here is simply no indication that the term 'practice' converts related discrete acts into a single unlawful practice for the purposes of timely filing". *Id.* at 2071.

■ The *Bazemore* holding supports the conclusion that receipt of allegedly discriminatory pay is a discrete act of discrimination that does not warrant application of the continuing violations theory. As previously noted, *Bazemore* holds that "[e]ach week's paycheck that delivers less to a black than to a similarly situated white is a wrong actionable under Title VII." *See Bazemore*, 478 U.S. at 395–96, 106 S.Ct. 3000. Because each discriminatory pay check is unlawful, issuance of such a paycheck is a discrete act of discrimination that, like a termination, a failure to promote, or refusal to hire, is easily identifiable, its occurrence can be pinpointed in time, and is itself actionable. In dicta, the Seventh Circuit similarly noted that discriminatory pay claims are often comprised of discrete acts of discrimination: "We too have noted the contrast between a continuing wrong, such as deliberate indifference to a prisoner's medical treatment, and discrete acts, such as consistently underpaying an employee because of her sex." *CSC Holdings, Inc. v. Redisi*, 309 F.3d 988, 992 (7th Cir.2002) (citation omitted).

■ Hostile work environment claims are different in kind, and the *Morgan* Court stated as much. *Morgan*, 122 S.Ct. at 2073. A discriminatory work environment and a discrete act of discrimination manifest differently. *Id.* Specifically, hostile environment claims do not take place on a single day; rather, they unfold over a period of time because "[s]uch claims are based on the cumulative affect [sic] of individual acts." *See id.* Therefore, " '[t]he unlawful employment practice' ... cannot be said to occur on any particular day. It occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own." *Id.* It is this difference in the very nature of the claims that makes application of the continuing violations doctrine appropriate in hostile work environment cases but inappropriate in cases challenging discrete discriminatory acts.

*Morgan* did not overrule *Bazemore*, but it does provide a basis upon which to distinguish *Bazemore* and shows that perhaps lower courts' reading of it was overbroad. The *Morgan* Court cited *Bazemore* as an example of an instance in which the Court has "repeatedly interpreted the term 'practice' to apply to a discrete act of a single 'occurrence,' even when it has a connection to other acts." *Id.* at 2071. The *Morgan* Court was careful to point out that *Bazemore* was a pattern-or-practice case challenging a discriminatory salary structure in place prior to and following the implementation of Title VII. *Id.* (citing *Bazemore*, 478 U.S. at 395, 106 S.Ct. 3000). Because the structure itself was still in place during the limitations period, the *Bazemore* Court held that the plaintiffs' claims were timely. *Id.* (citing *Bazemore*, 478 U.S. at 395, 106 S.Ct. 3000).

In other words, because the discriminatory structure was still in place at the time

the *Bazemore* plaintiffs challenged it, each paycheck represented a perpetuation of that discriminatory pay system. However, once that discriminatory pay structure has been discontinued, instead of perpetuating a discriminatory system, each paycheck represents a non-actionable lingering effect of a prior discriminatory system. *Compare Bazemore*, 478 U.S. at 395, 106 S.Ct. 3000 (receipt of discriminatory pay in pattern-or-practice case represents an actionable wrong), *with Delaware State College v. Ricks*, 449 U.S. 250, 257, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980) ("Mere continuity of employment, without more, is insufficient to prolong the life of a cause of action for employment discrimination."), *and United Air Lines, Inc. v. Evans*, 431 U.S. 553, 558, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977) (lingering effects of prior discrimination do not form basis for Title VII liability). Had the Inglis plaintiffs brought suit to challenge BVU's compensation system within 300 days of its discontinuance, their claims would have been timely under *Bazemore*.

### 3. *Application of* Morgan *to pay claims*

There are very few decisions interpreting pay claims in light of *Morgan*. However, *Morgan* will likely halt the previous trend of analyzing pay claims under a continuing violations theory without distinguishing between discriminatory pay policies and discrete discriminatory acts. The most stark example of this changing of the tides can be seen in the Tenth Circuit. While one circuit panel cannot reverse another panel's decision, it is difficult to reconcile the reasoning of pre- and post-*Morgan* decisions in that circuit.

A comparison of two Tenth Circuit cases, both decided in 2002, is revealing of the impact of *Morgan* on pay discrimination claims. *Morgan* was decided on June 10, 2002. In January of 2002, the Tenth Circuit decided *Goodwin v. General Mo-*

*tors Corp.*, 275 F.3d 1005 (10th Cir.), *cert. denied*, —— U.S. ——, 123 S.Ct. 340, 154 L.Ed.2d 248 (2002). In *Goodwin*, the plaintiff brought a Title VII action against her employer, claiming that it had discriminated against her on the basis of race by paying her a significantly lower salary than similarly situated white employees. *Id.* at 1007–08. Goodwin suspected that General Motors paid her less than it paid her colleagues, but it was not until a printout listing of salaries mysteriously appeared on her desk that she in fact knew of the others' rates of compensation. *Id.* at 1008. But because her salary was lower than her coworkers' salaries because of her starting wage, which was set seven years before she filed a charge, General Motors argued that her claim was time-barred. *Id.*

The *Goodwin* court held that, while continuing effects of prior discrimination are generally not actionable under Title VII once the 300 day filing period has passed, *United Air Lines, Inc. v. Evans*, 431 U.S. 553, 558, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977), *Bazemore* established "that a discriminatory salary is not merely a lingering effect of past discrimination—instead it is itself a continually recurring violation." *Goodwin*, 275 F.3d at 1009. The court summarized the holding in *Bazemore:* "Under *Bazemore*, then, pay discrimination must be viewed as a continually recurring series of violations, each of which is separately actionable under Title VII." *Id.* Accordingly, the Tenth Circuit held that Goodwin's claim was timely.

Eight days after the Supreme Court handed down the *Morgan* decision, the Tenth Circuit was again presented with the question of the timeliness of a pay discrimination claim in *Lewis v. Oklahoma ex rel. Board of Regents for Tulsa Community College*, 42 Fed. Appx. 160 (10th Cir. June 18, 2002). In an unpublished

opinion, the Tenth Circuit held that, because a Title VII plaintiff was aware that her salary was lower than her male counterparts' salaries, the continuing violations theory could not make timely her claim of pay discrimination, which was premised on wages set six and seven years before she filed her charge. *Id.* at 165–66. Without citing Morgan, *Bazemore,* or *Goodwin,* the *Lewis* court held that, because Lewis was aware of the need to assert her rights years prior to filing a discrimination charge, she could not establish the applicability of the continuing violations doctrine. *Id.* at 166.

While the *Goodwin* court mentioned knowledge as an alternative ground for its holding, the court unmistakably held that a claim of discriminatory pay was timely "as a continually recurring series of violations." *See Goodwin,* 275 F.3d at 1009–10. Thus, it is, at minimum, curious that *Lewis* neglected to mention this holding. However, the *Lewis* court's reasoning resonates with this court's understanding of *Morgan.*

The *Goodwin* court rightly pointed out that it would be absurd to expect a plaintiff to file a charge of discrimination when she did not know she was being discriminated against. *See Goodwin,* 275 F.3d at 1011 n. 6. As an alternative holding, the *Goodwin* court noted that, not until Goodwin received the printout list of her coworkers' salaries did she know she was being discriminated against. *Id.* at 1011. Because she promptly filed a discrimination charge and, ultimately, initiated a lawsuit after learning of the salary information, her claim was timely. *Id.* Indeed, in a footnote, the court commented that "[i]t makes no sense to suggest that Goodwin should or even could have filed her complaint before she knew about any adverse decisions." *Id.* at 1011 n. 6.

■ The *Goodwin* court's alternative rationale is nothing more than application of the "discovery rule" to an employment discrimination case. "Under equitable tolling, Title VII's statute of limitations period does not start to run until a plaintiff knew or reasonably should have known that she was being discriminated against." *Carter v. West Publ'g Co.,* 225 F.3d 1258, 1265 (11th Cir.2000) (citing *Ross v. Buckeye Cellulose Corp.,* 980 F.2d 648, 661 n. 9 (11th Cir.1993)).

The rationale underlying application of this principle to pay discrimination cases is obvious: it would be unfair to require a plaintiff to file a charge of discrimination when she has no knowledge of and could not have reasonably ascertained what similarly situated male coworkers were earning. Not until a discriminatory pay claimant knows she is earning less than similarly situated males does she know she is being discriminated against and is on notice of the need to assert her rights. If equitable tolling did not apply, maintaining strict salary confidentiality policies in most circumstances would isolate employers from Title VII liability because the filing period would pass before a victim of discrimination learned that she was being discriminated against.

■ The *Morgan* Court expressly recognized the continued viability of equitable tolling doctrines to Title VII's time period for filing a charge of discrimination, *Morgan,* 122 S.Ct. at 2072, but "[a] plaintiff who asserts the applicability of equitable tolling bears the burden of proving that it is appropriate." *Carter,* 225 F.3d at 1265 (citing *Ross,* 980 F.2d at 661). Here, the plaintiffs have not asserted any equitable tolling doctrine, such as the discovery rule, and, therefore, are not entitled to its application.

Equitable tolling in pay discrimination cases, which starts the limitations clock running when a pay discrimination claimant knows or should know that she is being discriminated against, is, in this court's

view, the best reading of *Morgan* and of its impact on pay discrimination claims. This is so because this interpretation is faithful to the *Morgan* Court's holding that discrete discriminatory acts are not actionable if time-barred, as well as is faithful to the *Bazemore* Court's holding in pattern-or-practice pay discrimination cases.

Here, the Inglis plaintiffs do not argue that they were unaware of any alleged pay discrimination. Instead, they concede that BVU correctly identified the dates that the limitations periods on their various claims commenced. Under *Bazemore* and *Morgan*, their pay claims implicate discrete discriminatory acts that, because the compensation system was discontinued, do not implicate the continuing violations doctrine. Construing the facts in the light most favorable to the plaintiffs, BVU discriminated against the plaintiffs when it hired them at starting salaries less than similarly situated male employees, when it awarded merit increases tainted by discrimination, and throughout the time it maintained that discriminatory pay structure.

Assuming that BVU maintained a discriminatory salary structure comprised of hiring women at lower rates of pay and awarding women discriminatorily low merit pay increases, BVU suspended that structure in the fall of 1997. Thus, unlike in *Bazemore*, there was no pattern-or-practice of maintaining a discriminatory pay structure in existence at BVU during the limitations periods. Therefore, the plaintiffs' pattern-or-practice argument fails to make timely their claims of pay discrimination.

 Between the fall of 1997 and May of 1999, BVU applied a neutral compensation system, which consisted of across-the-board cost of living adjustments and percentage-of-salary merit increases. Although this neutral policy had a more dramatic effect on women professors because their base salaries were lower, this fact does not make BVU guilty of a continuing violation. The last violations occurred with the last merit increases under the former system. While the record does not reveal when these salary adjustments under BVU's former compensation system occurred for each individual plaintiff, it suffices to state that the latest date was the fall of 1997, which is prior to the commencement of the limitations periods. Therefore, the plaintiffs' claims are time-barred.[8]

---

8. For willful violations, the EPA provides for a three-year statute of limitations. 29 U.S.C. § 255(a). Thus, if BVU were found to have willfully violated the provisions of the EPA, the plaintiffs would be entitled to challenge conduct dating back to November 6, 1997.

 A violation is willful only if "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the ... Act." *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133, 108 S.Ct. 1677, 100 L.Ed.2d 115 (1988). On the record before the court, the court doubts that the plaintiffs could prove a willful violation of the EPA in the face of the results of the statistical analyses done in this case. In any event, even assuming that the plaintiffs could generate a genuine issue of material fact as to the wilfulness of any alleged violation, the plaintiffs' EPA claims are still untimely because BVU suspended its former compensation system in the fall of 1997.

 The plaintiffs raised for the first time in their post-argument supplemental brief that BVU's discriminatory system was still in place during the limitations period and that the system was not, in fact, discontinued until May of 1999. This argument is inconsistent with its previous concession that it did not challenge BVU's former compensation system, which BVU defined as having been suspended in the fall of 1997. Inconsistent arguments raised in the plaintiffs' post-argument brief are not enough under Rule 56 to generate a genuine issue of material fact.

 Furthermore, the plaintiffs' sole argument in this regard is a conclusory statement that three male professors were hired at discriminatorily high salaries during the limitations period. Such conclusory assertions without

 The plaintiffs' pay received after the fall of 1997 was not itself discriminatory. Instead, it was a lingering effect of time-barred discrimination, and this lingering effect is not actionable. *See Evans,* 431 U.S. at 558, 97 S.Ct. 1885. "If the victim of an employer's unlawful employment practice does not file a timely complaint, the unlawful practice ceases to have legal significance, and the employer is entitled to treat the unlawful practice as if it were lawful. Because time-barred discriminatory conduct has no legal significance, neutral policies that give present effect to the time-barred conduct do not create a continuing violation." *City of Hialeah, Florida v. Rojas,* 311 F.3d 1096, 1101 (11th Cir.2002) (citing *Evans,* 431 U.S. at 558, 97 S.Ct. 1885) (internal citations omitted).

The Eleventh Circuit Court of Appeals recently applied this reasoning in *City of Hialeah, Florida v. Rojas,* 311 F.3d 1096 (11th Cir.2002). In *Rojas,* the plaintiffs alleged that the defendant engaged in a discriminatory policy of classifying Latino employees as "temporary" for longer periods of time than white employees. *Id.* at 1099. This classification impacted an employee's retirement compensation and longevity pay. *Id.* By the time the plaintiffs filed discrimination charges, the defendant had discontinued its previous policy, but having been classified as a temporary employee affected how much pension compensation a retired employee drew upon retirement, and even the current neutral policy impacted Latino employees more dramatically than white employees. *Id.* at 1102.

The defendant argued that, because the former system had been discontinued prior to the commencement of the limitations period, the plaintiffs' Title VII claims were time-barred. *Id.* at 1101. The Eleventh Circuit agreed and rejected the plaintiffs' attempt to invoke the continuing violations theory to save their claims. *Id.* Applying *Morgan,* the *Rojas* court held that, if the alleged facts were true, the employer committed an unlawful employment practice against the plaintiffs each time it reclassified them as "temporary," which occurred administratively every nine months. *Id.* at 1102. Thus, each time the defendant failed to elevate a plaintiff to permanent status, it committed a discrete act of discrimination. *Id.* The effect of the current system was "merely a present consequence of past discrimination which has no present legal significance because it lies outside of the statutory limitations period." *Id.* The limitations periods began to run for the plaintiffs on the last date on which they were denied permanent employment status. *Id.* For the named plaintiff in this class action, that occurred eighteen years before he filed an EEOC charge. *Id.*

 The Second and Seventh Circuits also hold that pay discrimination claims implicate discrete discriminatory acts that begin to accrue on the date of the alleged act of discrimination. *See, e.g., Pollis v. New Sch. for Soc. Research,* 132 F.3d 115, 119 (2d Cir.1997) (holding that recurring pay discrimination does not constitute a continuing violation because each receipt of a paycheck is the basis for a separate cause of action for which suit must be brought within the limitations period); *Dasgupta v. University of Wis. Bd. of Regents,* 121 F.3d 1138, 1140 (7th Cir.1997) (rejecting continuing violations theory of pay discrimination claim and holding that plaintiff's present salary was a non-actionable lingering effect of prior discrimination and that failure to correct a previous violation does not give rise to a new violation). These holdings harmonize well with the

---

any evidentiary support, such as the starting salaries of the identified professors, are insuf-

ficient to survive a motion for summary judgment.

underlying rationale of the continuing violations doctrine that it would be unreasonable to require a plaintiff to file charges within the statutory period. *E.g., Tinner v. United Ins. Co. of Am.*, 308 F.3d 697, 707–08 (7th Cir.2002) (citations omitted). This rationale derives from the fact that continuing violations do not occur on any particular day and may not on their own give rise to a cause of action. *See Morgan*, 122 S.Ct. at 2073. Because pay claims do give rise to a cause of action each time they occur and are easily identifiable, it is not unreasonable to expect a plaintiff to file a charge of discrimination within the limitations period, so long as she is aware of the discrimination.

The United States District Court for the District of Kansas is the only court after *Morgan* to apply the continuing violations doctrine to a pay discrimination claim. *See Tomita v. University of Kan. Med. Ctr.*, 227 F.Supp.2d 1171 (D.Kan.2002). In *Tomita v. University of Kansas Medical Center*, an Asian physician brought a Title VII claim against his employer, the University, which the University argued was time-barred under *Morgan*. *Id.* at 1172. Citing *Goodwin*, a *pre*-Morgan decision, the district court held that the plaintiff's claims were timely but that recovery was limited to a period no longer than two years before he filed his charge of discrimination. *Id.* at 1179–80.

This court recognizes that the *Tomita* court was bound by the Tenth Circuit's *Goodwin* decision, but this court respectfully suggests that *Morgan* abrogated the holding in *Goodwin* to the extent *Goodwin* held that all pay claims are continuing violations because they " 'involve[ ] a series of discrete, individual wrongs rather than a single and indivisible course of wrongful action.' " *Goodwin*, 275 F.3d at 1010 (quoting *Pollis*, 132 F.3d at 119).

*Morgan* explicitly rejected the Ninth Circuit's "serial violations" interpretation of the continuing violation doctrine: "There is simply no indication that the term 'practice' converts related discrete acts into a single unlawful practice for the purposes of timely filing." *Morgan*, 122 S.Ct. at 2071 (citation omitted). *Morgan* holds that "[t]he existence of past acts and the employee's prior knowledge of their occurrence ... does not bar employees from filing charges about related discrete acts so long as the acts are independently discriminatory and charges addressing those acts are themselves timely filed." *Id.* at 2072. In this court's opinion, the *Morgan* Court's rejection of the Ninth Circuit's "serial violations" interpretation precludes *Goodwin*'s conclusion that the lingering effects of prior discrimination can be challenged because of the nature of pay discrimination claims.

Judge Pratt, of the Southern District of Iowa, recently rejected a pay claimant's timeliness argument in *Krough v. Cessford Construction Co.*, 231 F.Supp.2d 914 (S.D.Iowa 2002). In that case, the plaintiff's starting wage was significantly lower than her male predecessor's starting wage. *Id.* at 916. She argued that her claim was timely because the pay discrepancy was a continuing violation. *Id.* at 921. However, Judge Pratt applied *Morgan* and held that:

> [T]he application of the continuing violation theory, allowing claims to be filed for actions occurring after the statute of limitations has lapsed when the violations constitute a continuing practice of discrimination, is limited to claims such as claims for a hostile work environment where the nature of the claim is ongoing discrimination and one example of discrimination does not prove the charge.

*Id.*

In *Krough*, the plaintiff did not challenge her employer's pay structure. In-

stead, she challenged her starting wage, and ample evidence existed that she was aware of the pay discrepancy long before the limitations period expired. *Id.* Here, similarly, regardless of whether the Inglis plaintiffs challenge BVU's prior pay structure or individual merit increases and their starting salaries, the limitations period has expired on these claims.

### C. Motion to Substitute

■ The final matter the court must address is plaintiff Inglis's Motion To Substitute. In its brief, BVU argues that plaintiff Inglis's claims should be dismissed under Federal Rule of Civil Procedure 25 because plaintiffs' counsel had not made a motion to substitute parties since BVU filed a suggestion of her death in November of 2001. (Doc. No. 17).

Rule 25 provides:

If a party dies and the claim is not thereby extinguished, the court may order substitution of the proper parties. The motion for substitution may be made by any party or by the successors or representatives of the deceased party and, together with the notice of hearing, shall be served on the parties as provided in Rule 5 and upon persons not parties in the manner provided in Rule 4 for the service of a summons, and may be served in any judicial district. Unless the motion for substitution is made not later than 90 days after the death is suggested upon the record by service of a statement of the fact of the death as provided herein for the service of the motion, the action shall be dismissed as to the deceased party.

FED. R. CIV. P. 25(a)(1).

Here, no party filed a motion to substitute parties within 90 days after BVU filed a suggestion of Inglis's death. However, the plaintiffs filed a Motion For Substitution Of Parties together with their resistance to the defendant's motion for summary judgment. They argue that dis-

missal would be improper because the representative of Inglis's estate, Peter Klaus Steinfeld, was never personally served with the suggestion of death. Thus, they contend that the ninety-day clock under Rule 25 has not yet begun to tick.

The Ninth Circuit Court of Appeals has addressed a similar issue and examined Rule 25 in *Barlow v. Ground,* 39 F.3d 231 (9th Cir.1994). There, the court held that Rule 25 commands that a suggestion of death be served on the deceased plaintiff's attorney, as well as on certain non-parties to the litigation. *Id.* at 233. The court reasoned:

Although Rule 25(a)(1) could be clearer, a careful reading of the rule coupled with an understanding of its function leads to the conclusion that the rule requires two affirmative steps in order to trigger the running of the 90 day period. First, a party must formally suggest the death of the party upon the record. *Anderson v. Aurotek,* 774 F.2d 927, 931 (9th Cir.1985); *Grandbouche v. Lovell,* 913 F.2d 835 (10th Cir.1990) (*Grandbouche*); 3B Moore's Federal Practice Par. 25.06[3] (2d ed.1991) ("a formal suggestion of death is absolutely necessary to trigger the running of the ninety days"). Second, the suggesting party must serve other parties and non-party successors or representatives of the deceased with a suggestion of death in the same manner as required for service of the motion to substitute. Fed. R.Civ.P. 25(a)(1). Thus, a party may be served the suggestion of death by service on his or her attorney, Fed.R.Civ.P. 5(b), while nonparty successors or representatives of the deceased party must be served the suggestion of death in the manner provided by Rule 4 for the service of a summons. *Grandbouche,* 913 F.2d at 837 ("the service required by Rule 25(a)(1) on non-parties, specifically

the successors or representatives of the deceased party's estate, must be served pursuant to Fed.R.Civ.P. 4"); *Fariss v. Lynchburg Foundry,* 769 F.2d 958, 961–62 (4th Cir.1985) (*Fariss*) (successors and representatives of the deceased party must be personally served the suggestion of death); 3B Moore's Federal Practice Par. 25.06[3] (2d ed.1991) ("service of the suggestion of death upon parties is to be effected in accordance with Rule 5, and upon non-parties as provided in Rule 4").

*Id.*

▮ BVU filed a reply brief but did not respond to the plaintiffs' argument and factual assertions in this regard. Indeed, the Proof of Service attached to BVU's suggestion of death did not indicate that anyone other than plaintiffs' former counsel and local counsel were mailed copies of the suggestion. The court agrees with the Ninth Circuit's reasoning employed in *Barlow* and believes that Rule 25 establishes a two-step process of service of a suggestion of death before dismissal is warranted. Because the representative of Ms. Inglis's estate was not served, Rule 25 does not require dismissal of Inglis's claims. *See Fariss,* 769 F.2d at 961 (although personal representative of deceased plaintiff did not move for substitution until more than 90 days after service of suggestion of death on plaintiff's original counsel, substitution was nevertheless timely, since suggestion of death was not personally served on personal representative). Furthermore, because her claims survive her death, the court hereby grants the plaintiffs' motion to substitute parties.

### III. CONCLUSION

Having determined that the Inglis plaintiffs' gender-based pay discrimination claims involve discrete acts of discrimination and that application of the continuing violations doctrine is not appropriate under *Morgan* because BVU discontinued the former compensation system prior to the commencement of the limitations periods, the court is compelled to find that the plaintiffs' claims are time-barred. Pay received thereafter was a lingering effect of time-barred discrimination, which does not give rise to Title VII liability because it has no legal effect. And because the court concludes that the plaintiffs' claims are untimely, it need not address the substantive arguments set forth by the parties.

THEREFORE, (1) the court **grants** the plaintiffs' **Motion To Substitute** the executor of plaintiff Inglis's estate for Ms. Inglis in this action; (2) the court hereby **directs the Clerk of the Court to amend the caption of the complaint to substitute** the deceased's executor, **Peter Klaus Steinfeld,** for plaintiff Laura Inglis as a plaintiff in this case; and (3) the court **grants** defendant's Motion For Summary Judgment. This case is hereby **dismissed in its entirety.**

**IT IS SO ORDERED.**